McBEATH v. CAMPBELL, Sheriff, et al. *
(No. 2869.)

Court of Civil Appeals of Texas. Amarillo.
Oct. 5, 1927.

Rehearing Denied Nov. 9, 1927.

1. Evidence ⟷121(15)—Statement to plaintiff that person, not offered as witness, said that sheriff wanted plaintiff at courthouse, held inadmissible in false imprisonment suit.

In action against sheriff for false imprisonment, testimony as to statement to plaintiff by his father-in-law that city marshal or another, neither of whom were offered as witnesses, said that sheriff wanted plaintiff to go to courthouse, *held* inadmissible and not binding on sheriff, who denied sending such message, and was not present at time, not being part of res gestæ because no one had arrested defendant by sheriff's order.

2. Evidence ⟷121(1)—Statement must accompany and characterize relevant and material act to be admissible as res gestæ.

To render statement admissible as verbal act under res gestæ rule, there must be a relevant and material act which it accompanies and characterizes.

3. Appeal and error ⟷837(11)—Trial ⟷105(2)—Statement to plaintiff that third person said that sheriff wanted plaintiff at courthouse was properly disregarded as hearsay in false imprisonment suit, and cannot be considered by appellate court, though admitted without objection.

Where plaintiff testified, in suit against sheriff for false imprisonment, that he went willingly with city marshal and another when his father-in-law told him that one of them had said that sheriff wanted him to go to courthouse, he was never placed in jail in such sheriff's county, and there was no evidence that such officer or any one acting under his directions ever arrested plaintiff, father-in-law's statement, being purely hearsay, was properly disregarded by

district court, and cannot be considered by appellate court, though admitted without objection.

4. False imprisonment ⟷39—Issue of sheriff's guilt of false imprisonment held not for jury under evidence.

In suit against two sheriffs for false imprisonment, evidence *held* insufficient to take to jury question of guilt of sheriff, in whose office plaintiff was questioned as to certain person's death.

5. False imprisonment ⟷15(1)—To charge false imprisonment defendant generally must have personally contributed wrong and acted pursuant to mutual understanding or common plan (Pen. Code 1925, arts. 1169–1172).

To charge one with participation in false imprisonment, under Pen. Code 1925, arts. 1169–1172, it is generally essential that he should have personally contributed to such wrong, and act done must have been in pursuance of mutual understanding or in furtherance of common plan, at least until termination of enterprise.

6. False imprisonment ⟷8—Sheriff's custody of person pending habeas corpus proceedings does not constitute false imprisonment.

Sheriff's custody of person pending habeas corpus proceedings does not constitute false imprisonment, as such person is under authority of writ until court determines whether to discharge or remand him absolutely, and sheriff has no authority after issuance and service of writ to act or give directions concerning him, except to obey writ and bring him before court, and is bound to hold him in custody after court fixes amount of bond until satisfactory bail is furnished.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, False Imprisonment.]

7. False imprisonment ⟷15(3)—Sheriff ignorant of deputies' acts in bringing person from another county and confining him in jail is not liable for false imprisonment.

Sheriff who was ignorant of his deputies' acts in bringing person from another county and confining him in jail is not liable to such person for false imprisonment.

8. False imprisonment ⟷15(3)—Sheriff is not responsible for deputies' arrest and imprisonment of accused without warrant, unless he committed crime within their presence or hearing or was guilty of breach of peace (Rev. St. 1925, art. 6870; Code Cr. Proc. 1925, arts. 212, 213, 215).

Sheriff is not responsible, under Rev. St. 1925, art. 6870, for his deputies' acts in arresting and imprisoning one accused of crime without warrant, unless crime was committed within deputies' presence or hearing, or arrested party was guilty of breach of peace, though such detention and incarceration amount to false imprisonment under Code Cr. Proc. 1925, arts. 212, 213, 215.

Appeal from District Court, Foard County; Robert Cole, Judge.

Action by P. M. McBeath against L. D. Campbell, Sheriff of Foard County, and oth-

---

⟷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted.

ers. Judgment for defendants, and plaintiff appeals. Affirmed.

B. Y. Cummings and McDonald & Anderson, all of Wichita Falls, for appellant.

Oswalt & Myers, of Crowell, and John Storey and Berry, Stokes & Killough, all of Vernon, for appellees.

HALL, C. J. The appellant filed this suit against L. D. Campbell, sheriff of Foard county, and W. Frank Edmonson, sheriff of Wilbarger county, and the sureties upon their respective official bonds, to recover damages for alleged false imprisonment.

No question is raised upon the appeal as to the sufficiency of the petition. Campbell and the sureties upon his official bond answered by general denial, and specially denied that said sheriff ever arrested or in any way restrained the plaintiff, and that the said sheriff made an investigation of the facts concerning the felony, which the appellant was suspected of having committed; that at the request of the district attorney, he left his office open at the courthouse in Crowell, for the use of the district attorney, and that when he, the said Campbell, returned from a trip to Foard City at night, he found the district attorney and certain peace officers from Hardeman and Wilbarger counties, together with the plaintiff, in his office at the courthouse and that he did not commit any of the acts complained of in the plaintiff's petition, nor did he direct or advise the commission thereof, and was therefore not responsible for any of the alleged wrongs.

Sheriff Edmonson and the New Amsterdam Casualty Company, as surety upon his official bond, answered by general denial, and specially denied that the defendant Edmonson had anything whatever to do with the acts complained of in the plaintiff's petition; that he did not arrest plaintiff and had nothing to do with the arrest of plaintiff and did not in any manner restrain him of his liberty; that he was not present, if he was restrained, and did not authorize or instruct or acquiesce in any unlawful act of any other person, in connection with such alleged arrest, and that of his deputies, or either of them, participating in such alleged arrest of plaintiff, such acts on the part of said deputies were without the knowledge or authority of defendant Edmonson, and were done without his instructions, and that he never at any time acquiesced in or ratified said acts.

At the conclusion of the evidence the court directed the jury to return a verdict in favor of all defendants. From the judgment entered in accordance therewith, plaintiff prosecutes this appeal.

The circumstances which gave rise to this action may be briefly stated as follows: A few days prior to the alleged arrest of the appellant, he, together with a neighbor, Sid

Phillips, had assisted appellant's brother, A. D. McBeath, in loading the brother's household goods into a railroad car at Crowell, for the purpose of having said goods transported to New Mexico. That appellant and Phillips left the said A. D. McBeath in the car at Crowell in the early morning hours of the 14th of January, 1926. That they were the last persons who saw the said A. D. McBeath on that morning, and thereafter his dead body was discovered in the car when the train reached Chillicothe, Tex., a town situated about twenty miles north of Crowell. January 14, 1926, was Thursday. The deceased, McBeath, was buried at Crowell on Saturday, January 16th, and on that night appellee Campbell called the appellant to the courthouse in Crowell, together with the county attorney of Foard county, and interrogated him concerning the death of A. D. McBeath for about 30 minutes, after which he was allowed to go to his home, several miles in the country. On the following night, being Sunday, January 17th, about 11 o'clock, Bob Thomas, the city marshal of Crowell, in company with one Guy Crews, went to the house of appellant's father-in-law, where appellant, his wife and baby, were spending the night, and told appellant that Sheriff Campbell wanted him to come to the courthouse at Crowell, and that the sheriff and Mr. Storey, the district attorney, wanted to talk with him. It further appears that at the same time, Sheriff Campbell, in company with Deputy Sheriff McClendon, of Wilbarger county, went to the house of Sid Phillips and required him to come with them to the courthouse at Crowell. After the appellant reached the courthouse, Leveritt, a deputy sheriff from Hardeman county, Storey, the district attorney, Watts and McClendon, deputy sheriffs from Wilbarger county, appellee Campbell, Jack Roden, and detective for the railway company by the name of Thompson, all came to the courthouse. The appellant's version of what occurred afterwards is in part quoted from the statement of facts, as follows:

"They took me into Mr. Campbell's office. Mr. Campbell was in there part of the time during the conversation that occurred in there. I heard a part of the accusation made against me. * * * Mr. Storey started in about the loading of the car and what time I left the car, and what time I got home, and then he told me that I killed my brother with a scoop shovel, and he says, 'There isn't a damn bit of use denying it; you know damn well you done it, and we have got straight dope on it, and we don't have to go very far after it, no further than the jailhouse.' I told him I didn't do it. I couldn't say that Mr. Campbell was present at that time. I had my back turned to the door. Mr. Campbell came in shortly afterwards. And Mr. Storey told me that I didn't know that there was any officers out at the cemetery, when I was out there, watching me, and that I pretended to take my brother's death awful hard, and that I pretended to have a handkerchief over my eyes, and that I was tak-

ing my brother's death awful hard and that I was getting awful damn brave, but I wouldn't be so damn brave when they got through with me. And Mr. Campbell stepped around in front of me and told me that this was getting mighty serious, and that I had better come clean and tell the truth about it, and I says 'I have told you the truth, all the way through, and you know it.' That was Mr. Campbell, the sheriff of this county, that I told that. They kept me there something like 1½ hours. I don't know exactly what time I got to Vernon that night, but I heard one of them say it was 4 or a little after, on the road to Vernon. I left out here at 11 o'clock, which was about 5 miles, or 4½, from Crowell. After I left the sheriff's office down here, they took me straight to Vernon. Mr. Campbell was here when we left for Vernon. As to whether we left out of his office in charge of these other men in Mr. Campbell's presence, they all went out just a little bit before I went out. After Mr. Campbell had said that they all got up and went out of the room, except Clyde Watts and myself, and were gone probably a minute or maybe a minute and a half, and Mr. Boyd McClendon came back in and said, 'Well, come and go with us,' and says, 'You haven't got no gun on, have you?' and started to search me, and did search me, and I said, 'No, sir; I haven't.' And they carried me down there and put me in Mr. Storey's car, and we turned around the corner, or started to turn the corner, and one said, 'I forgot my overcoat;' and Mr. Storey turned around and come to the sidewalk, and Mr. Campbell was about half way from the steps to the street, and Mr. Campbell went back and unlocked the courthouse door, and they went in and got the overcoat and come back out together, and at the end of the steps Mr. Campbell turned to the left and Mr. Boyd McClendon turned to the right, and we went to Vernon. Mr. Campbell was there in the presence and saw me when I left for Vernon. At that time nobody showed me any warrant. They did tell me that they had a warrant. Those fellows from Hardeman county did not claim to me that they had any warrant for me."

"I asked the jailer [at Vernon] to send a telegram to Mr. Tom Bell at the Bank of Crowell to let the folks know where I was at. * * * That was on Monday morning.

"Saturday was the 17th and Monday was the 18th, so it was on the morning of the 18th that I made the request that a message be sent to Mr. Bell. ' * * * As to whether they sent the message for me, or allowed me to send it, the jailer said he couldn't do it. Up to that time nobody had ever showed me any papers authorizing my arrest. When I stayed over there in jail in Vernon for two days I did that unwillingly. Tuesday was the 'first time I got into communication with anybody over there. * * * As to whether anybody showed me any papers during Monday or Tuesday, Judge Leak came up Tuesday; he came some time in the afternoon Tuesday, I don't know just what time, and said we would have a habeas corpus trial at 7. Judge Leak was employed by Mr. Morgan; Mr. Morgan was my father-in-law, the man whose house I left on Sunday night. * * * When they had the habeas corpus Tuesday night at 7 o'clock, they agreed to let me out on a $2,500 bond, so they got the bonds up and signed them and accepted them, and we were fixing to start home, and the sheriff, I

believe it was, said they had received a telegram or something from the Hardeman county sheriff, and that they had to hold me longer, that they couldn't turn me loose. That was on Tuesday night. They then carried me back to jail and locked me up. I think it was the sheriff, Mr. Edmonson, that told me that they had to hold me further; and he held me further, until about 11 o'clock Wednesday morning. After the $2,500 bond had been fixed up at 7 o'clock Tuesday night, I was held over there until Wednesday morning, at 11 o'clock. I was then released and went home from there. When I got home I was not arrested any more. I heard something about Mr. Campbell filing a complaint against me here, charging me with murder, but I was never arrested on any warrant from that complaint, and have not been arrested yet. * * * I have not been indicted in either of those three counties for the killing of my brother. * * *

"When they came out there after me at my father-in-law's, they said that Mr. Campbell had sent for me to come up here, that Mr. Storey was here and wanted to talk to me. I didn't say anything; I got up and put my clothes on and come with Mr. Bob Thomas and Guy Crews to town, Guy Crews is a neighbor that lives there not very far from me. I couldn't swear whether it was Mr. Crews or Mr. Thomas that told me that Mr. Campbell and Mr. Storey wanted to see me. Mr. Crews and Mr. Thomas were both in the car. Neither of them went in the house, and they did not come to the door. * * * I had retired before that time. * * * My father-in-law woke me up; he went out and talked to them and came back and told me that Mr. Guy Crews said that Mr. Campbell wanted us to come up here at Crowell, that Mr. Storey was here and wanted to talk to us. I did not go out and talk to Thomas and Crews. I put my clothes on and went on out, and they were out at the car, and I got in the car and came in to town. Nobody told me that I was under arrest, and nobody forced me to get in the car. I came down here [Crowell] because Mr. Campbell sent after me. I did not object to coming down here that night. * * * I did not find out I was going to Vernon until I was in Vernon. I didn't ask anybody and didn't know where I was going until I got to Vernon. I didn't protest against it and didn't tell them that I did not want to go. As to whether anybody forced me to get in Mr. Storey's car out here, Mr. Boyd McClendon and them told me to go with them. As to whether they took me by the arm and pushed me in the car, they taken me by the arm when we walked out of the office. Boyd McClendon did that. I expect I would have gone with him if he hadn't taken me by the arm, as he was the law and told me to go. * * * I saw the jailer at Vernon. I believe the first time that I saw Mr. Edmonson was on Tuesday evening. Sheriff Edmonson carried me from the jailhouse over to the courthouse, and that is the first time I had seen him, and that wasn't so very long after Judge Leak had had the conversation with me. I don't remember just how long. I went over to the courthouse and they made the agreement about the bond; I agreed to make the $2,500.00 bond; there was no hearing. There had not been any warrant issued for me in the matter up to the time that I went to Vernon."

Appellee Campbell testified without contradiction that appellant was in the sheriff's office during the night, at the request of the district attorney, but that he did not know who communicated the request to appellant. He said he did not send anybody to him, did not go out where appellant lived nor near there; that he had learned later that Bob Thomas, the city marshal, went out to where appellant was; that he had no conversation with Thomas before he went. He further testified that Storey told him over the phone he wanted to have an investigation over here tonight, as soon as he could drive it, and he wanted him to get Phillips and Parlin McBeath in here to the courthouse. He further testified in substance:

"I told him at that time I could not at that time see the parties for him, that I had to go to Foard City on other business. He then requested that I leave the courthouse open and the sheriff's office open, so he could get in, and I did, and I then went to Foard City before I went out to Sid Phillips. In the meantime, I had not learned that anybody had gone out for McBeath, and the first time I learned it was when I got back from Sid Phillips. I saw McBeath in the courthouse, but not in my office—out in the hall. He was later taken to my office and was probably in there 30 or 40 minutes. He was in there twice, I think. Mr. Storey talked to him twice during that time. Mr. Oswalt, county attorney, Mr. Storey, district attorney, and Mr. Roden, constable, from Margaret, Watts and McClendon, deputy sheriffs from Vernon, were each in there part of the time. I never had a conversation with Storey about what he would do with them. I did not do anything with them. They were there in my office, and McBeath was at liberty to go as far as I was concerned at any minute he was ready to go. I knew of no warrants for him. Storey told me when he got ready to go to Vernon that he had warrants issued in Hardeman for him. That was probably 2:30, or 3 o'clock at night. I was at my office at that time, at the request of Mr. Storey, to assist him in anything that he might ask me to do. He never asked me to hold this man, and I could not say that he was held there. When Storey got ready to go, he said: 'You are going to Vernon with me;' that was in my office, in my presence, and I made no objection to it. I had been requested to get McBeath and bring him to my office, but I did not get him. When somebody else had gone and got him, I came back, and was present some 40 minutes. I was out and in. A day or so after that, I filed a complaint against him. The county attorney brought a complaint in my office, laid it down, and said, 'Mr. Storey said sign this complaint;' and that Storey had called him over the phone. I said I understood he already had complaint or warrants from Hardeman county. I got my telephone and called Storey and asked him about it, and if he wanted me to make complaint against McBeath here. He said, 'Yes, I do; it is necessary that you do that, and I request that you do it.' I said, 'Very well.'"

[1] Thomas was city marshal of Crowell. Crews was a private citizen living in appellant's neighborhood. Neither Crews nor

Thomas were offered as witnesses. The appellant insists that Campbell was responsible for the arrest and imprisonment of the appellant, but we find no testimony which even tends to sustain that contention, unless it be the statement which appellant's father-in-law made to the appellant, at the former's home, that Crews or the city marshal said that Sheriff Campbell wanted appellant to go to the courthouse at Crowell that night.

It may be inferred from appellant's testimony that Crews and Thomas also told him that Campbell wanted him to come to Crowell and talk to Storey. Even though they told both appellant and his father-in-law, the result is the same. This statement was not admissible for any purpose, and certainly was not binding upon Campbell, who denies having sent any such message, and was not present when it was made. It was not a part of the res gestæ, because no one had arrested appellant by the order of Campbell.

[2] To render a statement admissible as a verbal act under the res gestæ rule, there must be a relevant and material act which it accompanies and characterizes. 11 Encyc. of Ev. 381; 22 C. J. 449, 450; Huth v. Huth, 10 Tex. Civ. App. 184, 30 S. W. 240; St. Louis. B. & M. Ry. v. Jenkins (Tex. Civ. App.) 172 S. W. 984; State v. Ryder, 80 Vt. 422, 68 A. 652.

[3] The main fact to which this unsworn hearsay statement is supposed to relate is that appellant was arrested or imprisoned by Campbell, or some one acting under his direc tions. Appellant testified that when his father-in-law, Morgan, told him what Crews and Thomas had said, that he went to Crowell with them willingly. We seriously doubt whether he was in fact ever arrested or illegally restrained until the Wilbarger county deputy sheriffs and the district attorney started with him to Vernon. He was never placed in the Crowell jail. There is not a scintilla of evidence showing that Campbell or any one acting under his directions ever arrested appellant. Moreover, appellant's father-in-law could not have properly testified that Campbell had told Crews or the city marshal that Campbell wanted appellant to go to Crowell. Barnes v. Barnes (Tex. Civ. App.) 261 S. W. 485. So the statement, being purely hearsay, was properly disregarded by the district judge as evidence, and cannot be considered by this court, even though it has been admitted without objection. Henry v. Phillips, 105 Tex. 459, 151 S. W. 533.

[4] We therefore conclude the court did not err in directing a verdict against appellant, in so far as appellee Campbell is concerned.

[5] There is no testimony which brings the matter, so far as Campbell is concerned, within Pen. Code 1925, arts. 1169, 1170, 1171, or 1172. Kress & Co. v. De Mont (Tex. Civ. App.) 224 S. W. 520; H. & T. C. Ry. Co. v. Roberson (Tex. Civ. App.) 138 S. W. 822; Triangle Motors Co. v. Smith, 216 Ky. 479, 287

S. W. 914; Humphreys v. Ry. Co. (Mo. App.) 286 S. W. 738. To charge one with participation in a wrong of this character, it is generally essential that he should have personally contributed to it. Wolf v. Perryman, 82 Tex. 112, 17 S. W. 772. And the act done must be in pursuance of a mutual understanding or in furtherance of a common plan at least until termination of the enterprise. Cherry v. Preston (Tex. Civ. App.) 221 S. W. 1100; El Paso Electric Co. v. Crews (Tex. Civ. App.) 277 S. W. 732; 25 C. J. 497.

[6] The next question to be considered is, Did the court err in directing a verdict in favor of Sheriff Edmonson? It is conceded that Edmonson knew nothing personally about the detention or imprisonment of appellant in the jail at Vernon until Tuesday afternoon, when he carried him over from the jail to the courthouse, in obedience to the writ of habeas corpus. The habeas corpus proceedings were instituted about 1:30 or 2 o'clock. Appellant says he did not see Edmonson until about 7 o'clock, when he (Edmonson) came for him to carry him to the courthouse. The custody of appellant during the pendency of the habeas corpus proceedings does not constitute false imprisonment, because the appellant was then under the authority of the writ of habeas corpus until the court determines whether it is proper to discharge or remand him absolutely. After the issuance and service of the writ, Edmonson had no authority during that time in acting or giving any directions touching the appellant, further than to obey the writ and bring him before the court. Barth v. Clise, Sheriff, 12 Wall. 401, 20. L. Ed. 393; Church on Habeas Corpus (2d Ed.) §§ 175, 176; 29 C. J. 154. When the court had fixed the amount of the bond, it was the duty of Edmonson to hold the appellant in his custody until satisfactory bail had been furnished, and the record shows that this was not done until Wednesday morning, at which time Edmonson released him from custody.

[7] The only other supposable theory upon which Edmonson could be held liable in this action is because of the conduct and acts of his deputies, Watts and McClendon.

[8] The uncontradicted evidence shows that the deputies acted without the knowledge or consent of Edmonson in bringing appellant from Crowell and confining him in the jail at Vernon. So far as this record shows, the jailer acted upon the orders of the two deputies. He had no discretion in the matter and no wrong is charged against him. Edmonson, being ignorant of that proceeding, was not liable. Meyer et ux. v. Monnig D. G. Co. (Tex. Civ. App.) 189 S. W. 80. It may be admitted that under C. C. P. 1925, arts. 212, 213, and 215, that the detention and incarceration of appellant by the deputies amounts to false imprisonment. R. S. 1925, art. 6870, provides that sheriffs shall be responsible for the official acts of their deputies. The rule seems to be settled in this state that a sheriff is not responsible for the acts of his deputy in arresting and imprisoning one accused of crime without a warrant, unless the crime was committed within the presence or hearing of the deputy, or the arrested party is guilty of a breach of the peace, and the cases announce the rule that an arrest and imprisonment by a deputy under any other circumstances are not official acts within the meaning of the statute for which the sheriff is liable. King v. Brown, 100 Tex. 109, 94 S. W. 328; Brown v. Wallis, 100 Tex. 546, 101 S. W. 1071, 12 L. R. A. (N. S.) 1019; Maddox v. Hudgeons, 31 Tex. Civ. App. 291, 72 S. W. 414.

Finding no reversible error, the judgment is affirmed.