## McBEATH v. CAMPBELL et al.
### (No. 1118—5045.)

Commission of Appeals of Texas, Section A.
Jan. 2, 1929.

B. Y. Cummings and McDonald & Anderson, all of Wichita Falls, for plaintiff in error.

Berry, Stokes, Warlick & Gossett and J. A. Storey, all of Vernon, and Oswalt & Myers, of Crowell, for defendants in error.

CRITZ, J. This case was originally filed in the district court of Foard county, Tex., by P. M. McBeath, plaintiff in error, hereinafter designated plaintiff, against L. D. Campbell, sheriff of Foard county, Tex., and his official bondsmen, who are private individuals, and W. Frank Edmonson, sheriff of Wilbarger county, Tex., and his official bondsman, New Amsterdam Casualty Company, a corporation, for damages on account of an alleged false arrest and imprisonment of the plaintiff by said two sheriffs. The pleadings of the parties are rather voluminous, and we will not attempt to restate them here. Suffice it to say that the pleadings of all parties are sufficient to raise the issues here discussed.

We find it necessary to make a rather extended statement of the evidence in the case, which is in substance as follows:

The plaintiff himself was sworn as a witness, and testified, in substance, that he had a brother by the name of A. D. McBeath who died on the 14th of January, 1926. (It seems that this brother was found dead in a box car under circumstances that led to suspicion of foul play.) Plaintiff then further testified that after the burial of his brother he was called to the courthouse in Foard county on Saturday night, and questioned by the county attorney and the defendant Campbell in regard to what he knew about his brother's death; that later on Sunday night, January 17, 1926, while he was staying at his father-in-law's house about 5 miles from Crowell, and about 11 o'clock at night the city marshall of Crowell and another man, not an officer, came to said house, and requested plaintiff to come to town, stating that the de-

fendant Campbell wanted him to come, and that the district attorney was there and wanted to talk to him; that plaintiff went to town with said two parties in their car, and was brought directly to the courthouse; that a few minutes after he arrived in the courthouse he saw the district attorney, the defendant Campbell, and one Boyd McClendon, the latter being a deputy of the defendant Edmonson, and several other parties; that he did not know whether these parties all came together or part at a time; that Mr. Campbell was there part of the time during the events that occurred later; that he went into Sheriff Campbell's office and was there questioned and talked to by the district attorney in regard to his brother's death and accused of killing his brother; that he denied the killing; that at this time defendant Campbell told him that this was getting mighty serious and it would be better to come clean and tell the truth about it; that he told him that he had told the truth all the way through; that they kept him there at the courthouse in Foard county about 1½ hours, and then Mr. Boyd McClendon, who is shown to be a deputy sheriff from Wilbarger county, came back and said to the plaintiff, "Well, come and go with us;" that said McClendon then arrested the plaintiff and searched him, finding no arms; that he was then carried and put in an automobile and turned around the corner, and some one in the automobile said that he had forgotten his overcoat, and that they turned around and came to the sidewalk, and Mr. Campbell, who was about half way from the steps of the courthouse to the street, went back and unlocked the door, and went in and got the overcoat, with the party leaving it, and that the two came back out together; that at the end of the steps Mr. Campbell turned to the left and Mr. Boyd McClendon turned to the right, and plaintiff was then carried to Vernon, county seat of Wilbarger county, by Boyd McClendon and others, and locked up in jail; that they showed him no warrant, and, as far as he knew, no one claimed to have a warrant; that after he was locked up in Vernon in Wilbarger county he asked the jailer to send a telegram to Tom Bell at the bank at Crowell to let the folks know where he was; that his arrest took place on Sunday night, the 17th of January, 1926; that it was the 18th that he asked for the message to be sent to Mr. Bell; that this request was refused by the jailer; that they carried him to jail on Sunday night; that he had no communication with any of his friends or relatives, or any one else, that night or Monday; that on Tuesday, Judge Leak, an attorney for plaintiff, came up and said he would have a habeas corpus trial. The plaintiff further testified that Judge Leak had been employed by his father-in-law. The plaintiff further testified that they had the habeas corpus Tuesday night at 7 o'clock, no testimony being heard, and

agreed to let him out on $2,500 bond; that they got the bond fixed up, signed, and accepted, and plaintiff was fixing to start home, when Sheriff Edmonson told him they had received a telegram or something from the Hardeman county sheriff, and had to hold him longer, and could not turn him loose, this being Tuesday night; that he was carried back to jail and again locked up and kept there until 11 o'clock Wednesday morning, when he was released and went home, and was never arrested again. Plaintiff further testified that he had heard something about the defendant Campbell having filed a complaint against him, charging him with murder, but was never arrested on any warrant on that complaint. (Campbell testified to having made this complaint on the 18th, but the docket entry of the justice court in Crowell shows that the complaint was filed on the 19th, docketed on the 19th, and the case dismissed the 19th without any warrant having been issued thereon.) We will state at this point that the record fails to disclose any legal authority for any bond, even by agreement, at the habeas corpus, under the facts above testified to.

The defendant L. D. Campbell was called as a witness by the plaintiff, and testified, in substance, that he remembered the occasion of the plaintiff being in his office on Sunday night in January, 1926; that he did not know who communicated with the plaintiff, and did not have anything to do with his being there; that he had no communication with the parties who caused plaintiff to come to the courthouse in Crowell; that on that day the district attorney told Campbell that he wanted to have an investigation that night in regard to the McBeath killing at the courthouse; that he told the district attorney that he had to go to Foard City on other business, and the district attorney requested that he leave the courthouse open, and the sheriff's office open, so that he could get in; that he did as requested and went to Foard City, and came back after going to Foard City and Sid Phillips' house; that the first time that he learned that anybody had gone after McBeath was when he saw him in the hall of the courthouse; that later plaintiff was taken to said witness' office, where he remained about 30 or 40 minutes, and the district attorney talked to plaintiff; that at that time the county attorney, the district attorney, and several other parties were there, including Mr. Watts and Mr. McClendon, deputy sheriffs from Wilbarger county; that he had no conversation with these parties about what was to be done with the plaintiff; that he never arrested McBeath, and, as far as he was concerned, McBeath was at liberty to go at any minute he got ready; that the district attorney told him, when they got ready to leave for Vernon, that he had had warrants for the plaintiff's arrest issued in Hardeman county; that he

did not know why they took him to Wilbarger county on a warrant from Hardeman county. This witness then testified that he was at his office at that time, at the request of the district attorney, to assist him in anything he might be asked to do; that he was never asked to hold this man; that when the district attorney got ready to go, he said to the plaintiff, "You are going to Vernon with me;" that this was said in the presence of witness, in witness' office, and he made no objection to it. The witness then testified that he filed the complaint against the plaintiff on Monday; that the county attorney brought the complaint to his office and laid it down and told him the district attorney said to sign it; that he asked the county attorney if he had talked to the district attorney, and he said that the district attorney had called him over the telephone; that witness then told the county attorney that he understood that a complaint had already been filed in Hardeman county, and then called the district attorney in Vernon and asked him about it, and the district attorney told him to file the complaint, and that it was necessary that he do so. As stated above, regardless of when this complaint was made, the docket entry of the justice court shows that it was filed on the 19th of January, and dismissed the same day, and January 19th was Tuesday, and no warrant issued thereon.

The defendant W. Frank Edmonson was called as a witness by the plaintiff and testified as follows:

"My name is Frank Edmonson and I am the Sheriff of Wilbarger County; that is, the excuse they have; and was such Sheriff during all of last year. I am now acquainted with the plaintiff, P. M. McBeth, I have seen him and know who he is. I was not acquainted with him prior to the 18th day of January, last year. I do not know what the day was when I first heard anything about Mr. McBeth being in my jail at Vernon, but it was right after he was put in there; Judge Leak called me up about it. As to whether it was on Monday morning; I don't know, Mr. Leak was getting out some kind of papers, writ of habeas corpus, I believe, and I didn't know McBeth was in my jail, and Mr. Leak called up and I found out that McBeth was in jail here, and I told Mr. Leak he was. I found out on Tuesday afternoon about 1:30 or 2:00 o'clock that McBeth was in my jail in Wilbarger County; in other words, he was in there a day and night, something like that, I disremember. I don't think that McBeth was held in the jail at Vernon but about two days, as well as I remember. Mr. Leak called me up was the first thing I knew about it. At that time I didn't know that McBeth was held without a warrant. As to whether anybody advised me that they did have a warrant for him; I didn't talk with anyone except Judge Leak, and he wanted to find out if he was in there; he told me he had a

writ of habeas corpus, and when I found out he was in jail I told him that he was in there. As to whether I continued to hold him in jail without a warrant; I didn't know anything about a warrant, I supposed somebody else had a warrant for him, he was brought from another county and wasn't my prisoner. But if they did have a warrant I never saw it, I never knew anything about it. I never had a warrant and none of my deputies had a warrant in my county. As to how long I held McBeth before he was discharged after I found out that he was in jail; I think it was that night or the next day, it seems to me like it was that night they had a hearing over there, I called the Sheriff of Hardeman County up about it and found out that McBeth wasn't my prisoner and I didn't worry any more about it. As Sheriff of Wilbarger County I suppose I have charge of the jail, I have got a jailer hired there and he is under me. In other words being Sheriff I am responsible for the prisoners and jail of Wilbarger County.

"I am just giving my best recollection of the dates upon which these things happened. As to whether anybody came to me at any time and asked me to turn this man out before I turned him out and before I let him go to the court house under the writ of habeas corpus; Judge Leak asked me if I would bring him over to the court house, and I said "Yes, sir," and Judge Leak went to Judge Cole and talked to him, and Leak then said 'you bring him over there,' and I brought him over. That was when I found out that McBeth was in jail, that afternoon about 1:30 or 2:00 o'clock when Judge Leak called me up. Nobody informed me that there was no warrant issued for him. I did not know that this prisoner was in jail when Judge Leak called me up. I did not know who put him in jail. I did not authorize Boyd McClendon or C. D. Watts, or any other person, to arrest McBeth. I was not over here at Crowell two nights prior to the time he had the hearing over there at Vernon. On the day that Judge Leak phoned me, when I said that I first found out McBeth was in jail, nobody came to me and requested me to release him. The plaintiff, Mr. McBeth, did not say anything to me about releasing him, I did not talk to McBeth. I was not asked to turn McBeth out of jail. Judge Leak wanted McBeth brought to the court house, and I said, 'He isn't my prisoner, if you will get an order from the Court I will bring him over,' and he went and saw the Court and the Court ordered him brought over there. Prior to that time nobody had asked me to turn him out or release him. When McBeth was first put in there I did not know who put him in the jail. I didn't know anything about whether a warrant had not been issued at the time Judge Leak first called my attention to him being in jail. After Judge Leak called me I found out whose prisoner he was; I did not know any-

thing about it at the time Judge Leak called me. I did not have any written notice of any kind of a habeas corpus hearing served on me —just ordered me to bring the prisoner over to jail, that they had one coming up, and we opened up the court house and turned on the lights, and I just waited on the Court."

Under this state of the record, and at the close of the plaintiff's testimony, as above set out, the trial court peremptorily instructed a verdict for all defendants. The verdict was returned as directed, and judgment entered accordingly. On appeal this judgment was affirmed by the Court of Civil Appeals, 4 S. W.(2d) 999. The case is now before this court on writ of error granted on application of plaintiff.

#### Opinion as to Defendant L. D. Campbell.

■ Without going into any extended discussion of the affair, we agree with the Court of Civil Appeals in their holding that the plaintiff was not arrested by the defendant L. D. Campbell, and that there are no facts in the record which are sufficient in law, viewed in their most favorable aspect for plaintiff, and against the said Campbell, which would justify a judgment against Campbell. It is not shown that Campbell had anything to do with the plaintiff's coming to the courthouse in Foard county on the night that he was arrested. It is true that the plaintiff testified that he was told that the defendant Campbell requested him to come; but the circumstance that other parties told him this did not prove the fact. There would be no violation of law in having an investigation with reference to the death of the plaintiff's brother, and the facts as testified to by the plaintiff do not show that the defendant Campbell took any part in his arrest in Foard county, or imprisonment in Wilbarger county. It is true that it is shown that the defendant Campbell made a complaint in Foard county, and that this was filed in the justice court, but this complaint was filed on the 19th, and it is not shown that this complaint had any connection whatever with the plaintiff's arrest or imprisonment. No warrant was issued on this complaint, no arrest was made thereunder, and it was dismissed on the same day that it was filed.

We therefore hold that the trial court was correct in peremptorily instructing the jury in favor of the defendant Campbell, and of course a verdict in favor of Campbell would also result in a verdict in favor of his bondsmen.

#### Opinion as to Defendant Edmonson.

The question as to whether, under the law, there is presented a case sufficient to be submitted to the jury against the defendant Edmonson requires the construction of the following statutes and principles of law, as applied to the facts disclosed by the record, viz.:

(a) Article 6869, Revised Civil Statutes of Texas 1925, provides that the sheriff has power to appoint certain deputies, who shall have power and authority to perform all the acts and duties of their principal.

(b) Article 6870 of said Statutes provides that the sheriff shall be responsible for the official acts of their deputies, and shall have power to require from their deputies bond and security, and shall have the same remedies against their deputies and sureties as any person can have, against a sheriff and his sureties.

(c) Article 5116 of said Statutes provides: "Each sheriff is the keeper of the jail of his county. He shall safely keep therein all prisoners committed thereto by lawful authority, subject to the order of the proper court, and shall be responsible for the safe keeping of such prisoners. The sheriff may appoint a jailer to take charge of the jail, and supply the wants of those therein confined; but in all cases the sheriff shall exercise a supervision and control over the jail."

(d) Article 212, Code of Criminal Procedure of Texas 1925, provides: "A peace officer or any other person, may, without warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony, or as an 'offense against the public peace.'"

(e) Article 213, said Code, provides: "A peace officer may arrest, without warrant, when a felony or breach of the peace has been committed in the presence or within the view of a magistrate, and such magistrate verbally orders the arrest of the offender."

(f) Article 215, said Code, provides: "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

(g) Article 217, said Code, provides: "In each case enumerated in this chapter, the person making the arrest shall immediately take the person arrested before the magistrate who may have ordered the arrest, or before the nearest magistrate where the arrest was made without an order."

(h) Article 1169, Revised Penal Code of Texas 1925, defines "false imprisonment" as follows: "False imprisonment is the willful detention of another against his consent and where it is not expressly authorized by law, whether such detention be effected by an assault, by actual violence to the person, by threats or by any other means which restrains the party so detained from removing from one place to another as he may see proper."

■■ (j) It is, and has long been, a generally recognized rule that there is no line of separation between the liability of joint

122

tort-feasors. The tort is a thing integral and indivisible, and any claim for injuries arising therefrom runs through and embraces every part of the tort. The liability of one cannot be carried into any portion of the joint tort that is not followed by an equal liability of the other tort-feasors. Each is liable for the whole, and the injured party may pursue one separately, or he may pursue all jointly, or any number less than the whole number. 26 R. C. L. p. 763, par. 13. False imprisonment is a tort, both under our statute and under the common law.

■ (k) The Bill of Rights, which is incorporated in the fundamental law of this state, guarantees to every citizen that he shall not be deprived of his life, liberty, or property except by due process of law. We hold that any arrest or imprisonment of any citizen of this state, no matter how poor or obscure, and no matter what may be his station in life, except as allowed or required by the laws of this state, is a violation of the Constitution of this state, and the courts of this state, when appealed to, will redress such wrong if it can be done in a lawful manner.

Now, bearing in mind the above statutory provisions, constitutional guarantees, and well-established principles of law, let us apply them to the facts of the case at bar, as shown by the record, and see if a case sufficient to go to the jury is presented against the defendant Edmonson.

■ The undisputed record as presented by this appeal shows that the plaintiff has been illegally and falsely arrested and imprisoned by some one. There is no proof that the plaintiff had committed an offense classed as a felony, or against the public peace in the presence of a peace officer, or any other person, so as to authorize an arrest without a warrant, under article 212, Code Criminal Procedure, above quoted; there is no proof that the plaintiff had committed any felony or breach of the peace in the presence or within the view of any magistrate, so as to authorize an arrest under article 213, Code Criminal Procedure, above quoted; and there is no evidence in the record that satisfactory proof was made to a peace officer, upon the representation of a credible person, that a felony had been committed by defendant, and that he was about to escape, so that there was no time to procure a warrant, so as to authorize an arrest without a warrant under article 215, Code Criminal Procedure, above quoted. Furthermore, plaintiff was not taken immediately before a magistrate after his arrest, as required by article 217, Code Criminal Procedure, above quoted.

We further hold that as a matter of law the facts as above set out show that the plaintiff was illegally arrested by Boyd McClendon, and perhaps others, at Crowell on Sunday night, in January, 1926, and illegally restrained of his liberty and transported from there on that same night to the county jail of Wilbarger county, Tex., where he was illegally and falsely imprisoned until the following Wednesday morning, when he was released, and that such arrest and imprisonment constituted one unbroken, continuous transaction.

The Court of Civil Appeals holds that the trial court did not err in directing a verdict for the defendant Edmonson for the following reasons:

(a) Because it is conceded, as stated by the Court of Civil Appeals, " * * * that Edmonson knew nothing personally about the detention or imprisonment of appellant in the jail at Vernon until Tuesday afternoon, when he carried him over from the jail to the court house, in obedience to the Writ of Habeas Corpus. The Habeas Corpus proceedings were instituted about 1:30 or 2 o'clock. Appellant says he did not see Edmonson until about 7 o'clock, when he (Edmonson) came for him to carry him to the court house. The custody of appellant during the pendency of the Habeas Corpus proceedings does not constitute false imprisonment, because the appellant was then under the authority of the Writ of Habeas Corpus until the court determines whether it is proper to discharge or remand him absolutely. After the issuance and service of the writ, Edmonson had no authority during that time in acting or giving any directions touching the appellant, further than to obey the writ and bring him before the court. Barth v. Clise, Sheriff, 12 Wall. 401, 20 L. Ed. 393; Church on Habeas Corpus (2d Ed.) §§ 175, 176; 29 C. J. 154. When the court had fixed the amount of the bond, it was the duty of Edmonson to hold the appellant in his custody until satisfactory bail had been furnished, and the record shows that this was not done until Wednesday morning, at which time Edmonson released him from custody."

(b) Because Edmonson, being ignorant of the acts of his deputies, is not responsible therefor, citing R. S. art. 6870, above cited, and King v. Brown, 100 Tex. 109, 94 S. W. 328, Brown v. Wallis, 100 Tex. 546, 101 S. W. 1071, 12 L. R. A. (N. S.) 1019, and Maddox v. Hudgeons, 31 Tex. Civ. App. 291, 72 S. W. 414 (writ refused).

We do not agree with the holding of the Court of Civil Appeals on either of the above grounds.

■ On the question of the lack of knowledge of the defendant Edmonson as to the imprisonment, the record discloses that he had nothing to do with the original arrest, and did not know that the plaintiff was incarcerated in his jail until the afternoon of Tuesday following his arrest on Sunday night. Had the false imprisonment then ended, the defendant Edmonson would not in law or in fact have been responsible for the plaintiff's arrest or imprisonment, but on Tuesday afternoon he found out that the defendant was in-

carcerated in his jail at Vernon. Under the express provisions of article 5116, R. S., above quoted, and under defendant's own testimony, he was the keeper of said jail, and was charged with keeping such prisoners as were confined therein by lawful authority. Certainly when the sheriff finds out that a prisoner is confined in his jail, which the law makes him the keeper of, and holds him responsible for, it is his duty to know by what authority he is confined therein, and he cannot close his eyes and fail to make investigation and excuse himself on the ground of lack of knowledge; and, further, he cannot excuse himself for suffering a prisoner to remain illegally confined in his jail after he knows he is there because said person was originally placed in jail without his authority, knowledge, or consent.

Under the view we take of this case, so far as Edmonson's personal liability is concerned, it is immaterial whether the persons who originally arrested plaintiff and imprisoned him in the Wilbarger county jail were deputies of defendant Edmonson or not. When he found the plaintiff in his jail, he, from that date, was charged, as a matter of law, with responsibility for his imprisonment, and, if a wrong was being committed by such imprisonment, he became, from the time of such discovery, a joint tort-feasor with those wrongfully arresting and placing him in said jail. In other words, we hold that under the facts as disclosed by the record in this case, the arrest and imprisonment of plaintiff from beginning to end was, in law, one continuous tort, and false imprisonment, except, perhaps, for the time he was in the actual presence of the court on habeas corpus. A tort of this kind and character is a thing integral and indivisible, and a claim for damages arising therefrom runs through and embraces every part of the wrong. The liability of one cannot be carried into any portion of the joint tort that is not followed by an equal liability of the other joint tort-feasors.

Further, we do not agree with the holding of the Court of Civil Appeals to the effect that the issuance and service of the writ of habeas corpus excused the defendant from liability for the imprisonment thereafter. The Court of Civil Appeals cites, in support of this holding, Barth v. Clise, Sheriff, 12 Wall. 401, 20 L. Ed. 393; Church on Habeas Corpus (2d Ed.) §§ 175, 176, and 29 C. J. 154.

In Barth v. Clise, supra, it is held by the Supreme Court of the United States that:

"By the common law, upon the return of a writ of habeas corpus and the production of the body of the party suing it out, the authority under which the original commitment took place is superseded. After that time, and until the case is finally disposed of, the safe-keeping of the prisoner is entirely under the control and direction of the court to which the return is made. The prisoner is detained, not under the original commitment, but under the authority of the writ of habeas corpus. Pending the hearing he may be bailed de die in diem, or be remanded to the jail whence he came, or be committed to any other suitable place of confinement under the control of the court. He may be brought before the court from time to time by its order until it is determined whether he shall be discharged or absolutely remanded. We have not overlooked the statute of 31 Car. II. This doctrine has been recognized by this court."

We do not have access to the second edition of Church on Habeas Corpus, but we have the first edition, and that work announces the same rule as Barth v. Clise. 29 C. J. 154, is to the same effect.

The rule announced in the above authorities has no application to relieve an officer from liability for false imprisonment under the circumstances of this case. Certainly it is not the law that an officer, or any one else, can imprison a citizen of this state, without authority of law, and in violation of his plain, constitutional, and statutory guaranty, thereby forcing him to resort to the writ of habeas corpus to gain his liberty, and then set up the remedy he has forced on the party so illegally arrested, or imprisoned, as a defense.

Furthermore, plaintiff testified that:

"When they had the habeas corpus Tuesday night at 7:00 o'clock they agreed to let me out on a $2500.00 bond, so they got the bonds up and signed them and accepted them, and we were fixing to start home, and the Sheriff, I believe it was, said they had received a telegram or something from the Hardeman County Sheriff, and that they had to hold me longer, that they couldn't turn me loose. That was on Tuesday night. They then carried me back to jail and locked me up. I think it was the Sheriff, Mr. Edmonson, that told me they had to hold me further; and he held me further, until about 11:00 o'clock Wednesday morning. After the $2500.00 bond had been fixed up at 7:00 o'clock Tuesday night, I was held over there until Wednesday morning at 11:00 o'clock. I was then released and went home from there. When I got home I was not arrested any more. I heard something about Mr. Campbell filing a complaint against me here charging me with murder, but I was never arrested on any warrant from that complaint, and have not been arrested yet."

The defendant, Edmonson, nowhere in his testimony disputes what the plaintiff says in his testimony above set out, and, according to plaintiff's testimony, a bond of $2,500 was agreed on, made, and accepted, and the plaintiff was fixing to start home, when the plaintiff was informed by Edmonson that he had received a telegram or something from the sheriff of Hardeman county, Tex., and then held the plaintiff until the next day, not be-

cause the bond was not accepted, but because of the telegram or something from the sheriff of Hardeman county.

What we have already said perhaps disposes of the holding of the Court of Civil Appeals to the effect that Edmonson, being ignorant of the acts of his deputies, is not responsible therefor; but we will discuss the authorities cited by that court:

Article 6870, R. C. S., has been cited by us. It provides that the sheriff shall be responsible for the official acts of his deputies, etc. This article is not authority to excuse a sheriff, where a citizen has been falsely arrested and imprisoned by his deputy, under the circumstances of this case, after he finds such prisoner in his jail and fails to release him.

In King v. Brown, supra, it is held by the Supreme Court that where the deputy had a right, under the law, to make an arrest without a warrant, and in so doing said deputy shot the person attempted .to be arrested, that the sheriff and his bondsmen were liable for the injuries, on the ground that since the deputy had a right under the law to make the arrest, that his act in so doing was an official act under what is now article 6870, R. C. S. 1925.

In Brown v. Wallis, supra, it is held by the Supreme Court that where the deputy was acting without a warrant, under circumstances that the law does not permit an arrest without a warrant, and assaulted and shot one Wallis, that the sheriff and his bondsmen were not liable, for the reason that the act of the deputy was not an official act under said present article 6870, R. C. S. In this case it is shown that the sheriff never, at any time, took any part in the affair, and never ratified or became a party thereto.

In Maddox v. Hudgeons, supra, it is shown that a burglary had been committed, and the sheriff went to the place. While the sheriff was absent, a deputy sheriff stated to a constable, without any authority from the sheriff, that the sheriff wanted said constable to assist in arresting the offenders. The constable arrested plaintiff in that case without a warrant, and put him in jail on directions from the deputy, where he was kept confined nine hours, when he was released on orders from the deputy. The sheriff knew nothing of said arrest or imprisonment until after said plaintiff had been released. Under this state of facts the Court of Civil Appeals held that the sheriff was not responsible for the unauthorized act of his deputy, or of said constable, and the Supreme Court refused a writ of error.

The facts of the case at bar are very different from the facts of the above cases. In none of the above cases is it shown that the sheriff took any part in or had any knowledge of any of the transactions until after they were complete. In the case at bar the defendant Edmonson found the plaintiff in his jail, where he was being illegally held and falsely imprisoned, and after so finding him there continued to hold him, under circumstances sufficient to raise the issue of a ratification of the acts of his deputy, if, indeed, his act does not in law amount to a ratification.

We pretermit any discussion of the liability of New Amsterdam Casualty Company, the official bondsman of the defendant Edmonson, as we are unable to say that this case, as to either Edmonson, or his said bondsman, has been fully developed.

We therefore recommend that the judgments of the district court and the Court of Civil Appeals be reformed, and affirmed as to the defendant in error L. D. Campbell, sheriff of Foard county, Tex., and also as to the defendants in error C. P. S. Standifer, H. K. Campbell, and A. D. Campbell, official bondsmen of said L. D. Campbell, and that the judgments of the district court and the Court of Civil Appeals be reversed as to the defendant W. Frank Edmonson, sheriff of Wilbarger county, Tex., and New Amsterdam Casualty Company, his official bondsman, and remanded to the district court for a new trial.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reformed and affirmed as to defendant in error Campbell and his bondsmen, and said judgments are reversed and cause remanded against defendant in error Edmonson and his bondsmen, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.