## HAMILTON v. CALIFORNIA CO.

### No. 1628.

Court of Civil Appeals of Texas. Eastland.
Feb. 12, 1937.

Rehearing Denied March 5, 1937.

Scarborough & Ely, of Abilene, for appellant.

Thompson, Knight, Baker & Harris, of Dallas, for appellee.

LESLIE, Chief Justice.

Dick Gregory, the sheriff of Mitchell county, Tex., arrested the appellant, C. H. Hamilton, without a warrant and confined him for a while in the Mitchell county jail. Hamilton sued the California Company to recover damages, claiming that such arrest was unlawful and induced and caused by said company through its agent, E. J. Cramer. The defendant entered a general denial, and at the conclusion of the testimony the trial court withdrew the case from the jury and rendered judgment in favor of the defendant. The plaintiff appeals, assigning as error this action of the trial court.

Four witnesses, including the plaintiff, testified on the trial, and each was placed upon the stand by the plaintiff. The evidence may be regarded as undisputed.

The California Company owned a producing mineral lease in Mitchell county. Said Cramer was its producing foreman and charged with the duty of protecting the company's physical properties. If Cramer induced or caused the false arrest, as alleged, the company would be liable and answerable for his conduct. The company so agreed on the trial, and thus the issue before us is narrowed to a determination of the sole question of whether Cramer induced or caused the sheriff of Mitchell county to make a false arrest of the appellant. Neither the sheriff nor Cramer is made a party to the suit.

The arrest is charged to have been made on November 18, 1934. Just prior to this time there had been a series of thefts of appellee's property. Cramer notified the sheriff of these thefts and that official endeavored to apprehend the thieves and recover the property. He and his deputy spent seven or eight nights upon the lease in an effort to suppress these depredations. On a night about a week prior to November 18, 1934, the sheriff and his deputy left the lease at about 3 o'clock a. m., and between that hour and sunrise the thieves again entered upon the lease, stole "another load of pipe," and escaped in a westerly direction toward Coahoma and Big Spring, Tex.

After this occurrence, the sheriff concluded that he ought to get onto the job "a little more," and he requested Mr. Cramer to notify him "if anyone was seen on the lease." Both the sheriff and Cramer inspected the "tread marks" or imprints made by the truck tires at the point where the tubing was stolen. Cramer followed them to the west about 10 miles until they were lost in the traffic of the public road. He made measurements, pictures, etc., of the same.

Just before the occasion of appellant's alleged arrest an employee of the company noticed a car or a truck maneuvering about the lease. At times it would stop for a brief while. Once it ran into some mesquite timber and remained for a short time. At times it ran with the lights on and at other times with them off. The employee reported this to Cramer who, in response to the sheriff's request, theretofore made, informed that official of the presence of the truck on the lease. Sheriff Gregory and his deputy, Cook, went immediately to the premises and incidentally met the appellant, his son, and son-in-law at a cattle guard over which they were about to pass from the company's lease into the public road. All parties appear to have stopped at this point and in a few minutes thereafter Cramer came up, stopped his car by the side of the road, and got out of same.

It was discovered at this time and place that there was none of the company's property on the truck. Cramer, by the use of a flashlight, inspected the tires upon the truck, and compared the tread marks of the same with the pictures, measurements, and drawings he had made of the tread marks of the tires on the truck that had carried away the tubing from the lease the week before. The sheriff made independent inspection and investigation of the same nature. Each of them, and independently of the other, concluded that the tires on the truck then driven by the appellant were the identical tires on the truck that carried away the tubing.

After the above matters and conversations had taken place, some one suggested to Cramer the propriety of making a complaint against the parties. To this suggestion Cramer demurred, stating that inasmuch as none of the company's property had been found on the truck, that "his hands were tied." He refused either to

make the complaint or advise the arrest of the parties. Thereupon the sheriff in consultation with the deputy Cook directed the latter to take the appellant and the other parties to Colorado. In proceeding to carry out the sheriff's instruction, the deputy asked the appellant if he knew "the way to Colorado" and the appellant responded that he did.

The sheriff, desiring to use his individual car in further search for testimony about the lease where the truck had been, borrowed from Cramer a company car in which the deputy should return to Colorado with the other parties. On this return the appellant rode in said car with the deputy, and the son and son-in-law drove the truck. There is no evidence that the car was other than a loan to the sheriff for the use of the deputy in his return to Colorado, and there is no evidence to show that Cramer knew the appellant rode in the car, or was to be taken in the car to Colorado. On arriving at Colorado, the parties were permitted to eat supper at a restaurant and thereafter were confined in jail. No regular complaint was filed against the appellant for four or five days thereafter. He remained in jail for some time before his discharge.

It is the appellant's theory that he was arrested without warrant as he "drove off the California lease" at the point above mentioned. The gist of his complaint is stated thus in his brief:

"The cases have held that no matter how long or short a man is deprived of his liberty, that such unlawful detention amounts to false imprisonment. In this case, The California Company was responsible for the detention of the appellant while the agent of The California Company was examining the truck tires to see if they were the ones that he had taken the measurements of on a previous occasion, and in this case even if The California Company was responsible, or, if acting in connection with the sheriff, both of whom are responsible for the appellant's unlawful detention, the appellant is entitled to go to the jury for the unlawful detention for the one and a half or two hours that he was detained in the county road."

In order that the nature of this case may be more truly reflected as well as our reasons for the conclusions we entertain concerning the appeal, it is necessary to state somewhat further and in detail additional facts disclosed by the record. For instance, when the identity or similarity of the tracks made by the tires on the truck in which the appellant was driving on November 18, to those made by the tires on the thieving truck that carried away the tubing a week before, was observed, Cramer and the officers soon thereafter went to Big Spring for the purpose of investigating and identifying the parties who had stolen the tubing. The ends of some of this tubing had been cut off and the tubing sold to a junk dealer at that place. This dealer identified the appellant's son and son-in-law as the culprits.

Further investigation by Cramer and the officials showed that about the same time (prior to November 18) the appellant, his son-in-law, John Rice, his son, George Hamilton, and one Leo Frits carried a truck load of about 551 feet of appellee's tubing to El Paso and sold the same to the El Paso Iron & Metal Company for the sum of $35.04. The appellant's testimony is that the son and son-in-law, with this load of tubing, came to his residence in Big Spring early one morning and that he joined them in the trip to El Paso, a distance of over 300 miles, starting at 5 a. m. That after selling the tubing, they returned to Big Spring, reaching that point around 2 o'clock the next morning.

In selling this tubing to the metal company a bill of sale was executed by the son-in-law, John Rice, who, instead of signing his true name, signed the fictitious name "Ed Harris, Box 123, Hobbs, New Mexico." The appellant's son, George Hamilton, witnessed the bill of sale, but, instead of signing his true name, he signed as "Charles G. Harmon, Hobbs, New Mexico." The other party, Leo Frits, followed suit and witnessed the bill of sale by signing thereto as his true name "A. J. Danner." The appellant likewise witnessed the bill of sale, signing his name, but stating his post office to be Hobbs, N. M., rather than Big Spring where he had resided since 1933.

There were other junk dealers in Big Spring, but no reason is assigned why the tubing was not sold to them at that point rather than transported to El Paso. In the signing of the fictitious names above, the appellant, while on the witness stand, recognized the handwriting of his son and son-in-law, respectively. He also denied any knowledge or understanding of why

the above procedure was adopted in making the bill of sale. He disclaimed any participation in the theft or any guilty knowledge of the same.

The testimony further shows that the appellant was himself in the "second hand business" buying "junk, metals, and iron," etc., at Big Spring. That on the afternoon of the day he was arrested his son George Hamilton and his son-in-law John Rice came to his residence and he proposed to furnish the gasoline for the trip if they would furnish the truck and go with him to Westbrook where he desired to get a secondhand stove that he claimed one Chalmers had given him and which he understood to be situated on the California Company's lease. On the trial he testified that they were unable to find Chalmers or the stove and that in an effort to get information as to the whereabouts of Chalmers they endeavored to cross over the lease to a nearby residence, but ran into some rod lines and then concluded to return to the public road and were so doing when they met the sheriff at the cattle guard.

The record further discloses that shortly before the alleged false arrest one Ollie Byrd, who resides at Westbrook, overtook the appellant in the vicinity of the appellee's lease, transporting a truck load of sucker rods which belonged to the said Byrd. The appellant explained that an unknown person had given them to him, but upon Byrd's demand his rods were unloaded.

On the trial of this case the appellant admitted that his son and son-in-law and Leo Frits had pleaded guilty to the theft of appellee's tubing which was sold in Big Spring and El Paso. He also admitted that the truck in which he was riding when the alleged arrest was made was the identical truck in which the company's tubing had been carried away. He admitted that the tires were the same and that the sheriff and Cramer had each correctly identified the tires as the ones used in carrying the tubing away. Also, that he had no permission from the appellee or surface owners to be on the lease.

Leo Frits was not present at the trial of this case, although the appellant saw him about ten days theretofore. The son-in-law was at Hobbs, N. M., and not present at the trial. The son was present in the courthouse, but not called as a witness. The foregoing statements are in substance the facts and circumstances out of which this litigation grows. They reflect the background of the same which is essential to an understanding of the issues presented.

We have not contented ourselves merely with reading the extracts from the testimony which we find incorporated in the respective briefs. We have more than once read and considered the testimony as a whole. As a result, we conclude that it does not establish that Cramer induced, requested, or directed the sheriff to make the arrest. There is no legitimate inference to be drawn from the testimony that he requested or directed any arrest at all and much less does it give rise to an inference that he requested or directed an unlawful arrest.

The trial court doubtless applied to the evidence the test or rule of law prescribed for such cases by our Supreme Court in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, wherein it was held:

"(1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force. If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.'"

Viewing the testimony in this record in the light most favorable to the appellant, we are of the opinion that the trial court, in the application of the above rule, committed no error in withdrawing the case from the jury and rendering judgment for the defendant.

█ To summarize briefly and to give special attention to certain phases of the testimony, it will be observed that Sheriff Gregory testified that Cramer did not direct or request the arrest, and the sheriff frankly assumed entire responsibility for the same. Since the truck had none of the appellant's property on it at the time, Cramer refused in a positive and affirmative manner to make a complaint or advise an arrest of any character. When he called for the sheriff to come out on the

204

occasion of the arrest, he was merely acting in obedience to that officer's previous request, and evidently he did not know whose truck was driving about over the lease, and certainly had no means of knowing who was in it. He was altogether within his right in appealing to the officers to aid him in the protection and recovery of the property intrusted to his care and for the safe-keeping of which he was responsible. He was entitled to enlist their aid in ferreting out the thefts and in the suppression of the depredations being perpetrated on the appellee's property. To seek such aid was his clear legal right. As said in Joske v. Irvine, supra, "From the mere exercise of this right the law will not permit the inference to be drawn that he 'requested or directed'" an unlawful arrest. Neither does the testimony indicate any collusion between the officers and Cramer, nor any attempt by him to direct or control their actions. Hence, upon the whole case, we conclude that the probative force of the testimony does not rise to the dignity of a scintilla of testimony indicating that Cramer induced or caused appellant's arrest. In contemplation of the law, there was not "any evidence" of the fact of false arrest caused or induced by Cramer.

There are numerous authorities warranting and compelling these conclusions. In addition to Joske v. Irvine, supra, we cite El Paso Elec. Ry. Co. v. Crews (Tex. Civ.App.) 277 S.W. 732; Meyer v. Monnig Dry Goods Co. (Tex.Civ.App.) 189 S.W. 80; Presley v. Ft. Worth & D. C. Ry. Co. (Tex.Civ.App.) 145 S.W. 669.

The appellant relies upon McBeath v. Campbell (Tex.Com.App.) 12 S.W.(2d) 118, Newton v. Rhoads Bros. (Tex.Com. App.) 24 S.W.(2d) 378, and Karner v Stump, 12 Tex.Civ.App. 460, 34 S.W. 656. We do not consider these cases in point. The facts of each case distinguish it from the instant case. A careful consideration of these cases disclose that the evidence in each of them was of such nature and probative force as to at least warrant the inference that the defendant or his agent requested or directed a false arrest. We believe the opinion in each of these cases properly appraises the testimony therein, but there is lack of any such testimony in this case.

For the reasons assigned, the judgment of the trial court is affirmed.