[No. 21132.    *En Banc.*    June 20, 1929.]

ERIC ÛLVESTAD, *Appellant,* v. C. E. DOLPHIN *et al.,* *Respondents.*[1]

[1]Reported in 278 Pac. 681.

*Martin J. Lund* and *John G. Lund,* for appellant.

*Thomas J. L. Kennedy* and *Arthur Schramm,* for respondents.

FULLERTON, J.—This is an action brought to recover in damages for an unlawful arrest and a false imprisonment.

At the time of the occurrences which give rise to the action, William B. Severyns was chief of police of the city of Seattle, and the New Amsterdam Casualty Company was surety on his official bond. C. E. Dolphin was a captain of police of the same city, and A. J. Hill and C. A. Seavers were policemen of the city. Eric Ulvestad was a bachelor, some fifty-five years of age, and for many years had been a resident of the city. He owned real property situated therein of considerable value. He had caused buildings to be erected on his property, which he had divided into apart-

ments, and these apartments he leased to tenants, save one which he retained for his own use as a home. The apartment he retained is not very minutely described in the record, but it was on the second floor of the building, and seems to have consisted of four rooms, one of which was furnished for use, and used, as a bedroom, another as a living room, which had in it a bed which could be folded into a wall of the room when not in use, the third was used as a kitchen or kitchenette, and the fourth as a bath room.

On May 11, 1924, a brother of Ulvestad went to the headquarters of the police department of Seattle, and complained to the captain, according to the written report of the captain, that Ulvestad,

". . . a bachelor owning between $30,000 and $45,000 worth of property, was being fed up with moonshine by a woman, and he was afraid they were trying to get his property away from him, and that he was in very bad shape and on the verge of D. T. and wanted him brought in and held for him until he sobered up."

No written complaint was filed against Ulvestad, nor was the oral complaint made a matter of record in the police office, nor was any warrant issued for Ulvestad's arrest. The police captain, however, called the policemen heretofore named, and orally instructed them to bring Ulvestad to the city prison. The policemen, with the brother, took an automobile belonging to the police department, and drove to the apartment house where Ulvestad made his home. On reaching the place, they rang the bell of the door leading to the apartment. To this Ulvestad made no response, whereupon the brother procured a ladder and placed it so as to reach a window opening into the apartment, and one of them climbed the ladder and rapped on the window. Ulvestad then came down and opened the entrance door, when the officers entered the build-

ing. Shortly thereafter they took Ulvestad into custody, drove him to the city police station and turned him over to the captain of police, who directed that he be confined in the city prison. No charge was then preferred against him, not even upon the police blotter, and it would seem that his name was not even registered thereon, as inquiries made at the police station by his friends during the week following his incarceration met with the response that no one bearing his name was confined in the prison. Two of his friends, not being satisfied with these reports, went to the prison in person. On inquiring for Ulvestad, they were told that no one of that name was confined therein. The jailer, however, allowed them to go inside, when they soon discovered him. This was in the afternoon of the eighth day of his confinement, and he was released later in the same evening.

The evidence is conflicting as to the happenings that occurred at the time Ulvestad was taken into custody. Ulvestad himself testified that, for a week or more prior to the arrest, he had been suffering with a cold and with rheumatism, and that he had employed a middle-aged woman as a nurse to care for him; that he was not drunk at the time, and had not been drinking prior thereto; and he relates conversations between the police officers and the brother, which would indicate that they had an entirely different purpose in taking him into custody than his immediate welfare.

The brother did not appear at the trial, but the police officers testified that, when they found the appellant, he was in an intoxicated condition and on the verge of delirium tremens; that there were a number of empty bottles in the room which had formerly contained moonshine whiskey, and that the rooms were in a disreputable condition. They even say that they

did not arrest him, that they "babied him along" so that he would go with them willingly by telling him that they would take him to a hospital where he could have the services of a doctor. The evidence of the officers as to his physical condition has some support in the testimony of persons in charge of the police station to which Ulvestad was taken, but their subsequent treatment of him would indicate that their statements as to his condition were somewhat exaggerated. They did not take him to a hospital, nor did they even call a doctor; they immediately locked him in a cell of the prison, and there suffered him to remain until his release, without further attention than the jailer usually gives to persons confined therein.

The brother, following the arrest, took into his possession the keys to the apartment rooms, ordered the nurse to leave the place, and put her belongings into the street. Subsequent to the arrest, he gave no attention to his brother; he did not visit him, and, in so far as the records show, made no inquiries concerning him. The persons, whose inquiries led to the release of Ulvestad, testified that he was in a bad condition physically when he was released, due to his confinement, and was taken by them to the home of his sister, where he was confined to the house for some time.

In his complaint in the action, Ulvestad named as parties defendant the chief of police and his bondsman, the police captain, and the police officers who took him into custody. At the trial, at the conclusion of his evidence, the court sustained a challenge as to its sufficiency made by the chief of police and his bondsman, and entered a judgment of dismissal as to them. The trial continued as to the other defendants, and a verdict was returned against them in the sum of one

dollar. From the judgment entered on the verdict, Ulvestad appeals.

■ The appellant first complains of the judgment of dismissal entered in favor of the chief of police and his bondsman. The trial court rested its judgment on the ground that there was no evidence showing or tending to show that the chief of police participated in the transaction leading up to the arrest and confinement of the appellant, or evidence that he had knowledge thereof until after the appellant's discharge; relying upon the rule announced by us in the case of *Pavish v. Meyers*, 129 Wash. 605, 225 Pac. 633. In that case, we held that the chief of police was not liable for the wrongful arrest of a person made by a police officer in which he did not participate, and of which he had no knowledge, and, if the present case presents no other consideration, unquestionably the rule applied by the court is controlling. But there is an element in the present case not present in the cited case.

The city of Seattle is empowered by the state constitution to frame a charter for its own government, which, when adopted, becomes "the organic law thereof," and the city has framed and adopted such a charter. By the terms of the charter, the chief of police is made "the keeper of the city prison," and the question is whether the duty imposed upon him by the charter renders him liable for the conduct of the persons immediately in charge of the prison, notwithstanding he may not have participated in or known of such conduct. It is our opinion that it does. As keeper of the city prison, the chief of police is bound in law to know who is confined therein, and bound to know the purpose for which any person confined therein is so confined. He cannot escape his obligations in this respect by placing the prison in the keep-

ing of others. If he does so, such others are his agents and he is responsible for their acts. In this instance, if the original arrest was unlawful, so likewise was the subsequent imprisonment, and since the chief of police suffered the appellant to be confined in the prison without lawful authority, he actively participated in the wrong, and is liable to answer for the wrong. In such cases there can be no division or splitting of liability.

One who participates in a wrong to the injury of another is liable for the entire wrong, no matter at what stage of the proceedings his participation in the wrong had its beginning. It is true that had the officers arresting the appellant taken him before a court authorized to try the offense of which they accused him, filed a complaint against him and caused him to be tried on the complaint, a conviction and sentence of the court would have justified the chief of police in confining him in the city prison pursuant to the judgment of conviction. But such was not their conduct. As we have said, there was no conviction or sentence. The officer took him into custody without a warrant, took him to the city prison, where he was confined for eight days, without inquiring into the fact whether or not he had been guilty of an offense. If, therefore, the arrest and imprisonment were without authority of a law, a question into which we shall presently inquire, the chief of police was answerable for the wrong, and the court erred in holding that neither he nor his bondsman were liable.

On the trial of the cause, the appellant requested the court to charge the jury to the effect that the arrest and imprisonment were unlawful, and to further charge them as to the law applicable to an unlawful arrest and a false imprisonment. The court refused to so charge, and gave to the jury the following instructions:

"On the 11th day of May, 1924, the defendants Hill and Seavers, under instructions from the defendant Dolphin, who was captain of police, went to the home of the plaintiff, took him into custody and took him to the city jail, where he was held for about one week. Said arrest was made without any warrant. The plaintiff claims that said arrest and confinement was illegal, and seeks to recover damages for such alleged illegal acts. The principal question for you to determine in this case is whether or not said arrest and confinement was legal or illegal. If the arrest and detention were illegal, then the plaintiff would be entitled to a verdict against all of the defendants. If said arrest was legal, then the defendants would be entitled to a verdict, unless you should further find from the evidence that the plaintiff was held for an unreasonable length of time, taking all the surrounding circumstances into consideration, or was mistreated, neglected or misused during the period of his detention. Ordinarily a police officer has no authority to make an arrest without a warrant, except in cases where he has reasonable ground to believe that a felony has been committed, or in cases where a misdemeanor is being committed in the officer's presence. And an arrest, made without a warrant, where such circumstances do not exist, is ordinarily unlawful. By felony is meant a crime punishable by death or by imprisonment in the state penitentiary; by misdemeanor is meant any crime not so punishable.

"This rule is subject, however, to the following exception:

"You are instructed that police officers are legally justified in taking into custody, without a warrant, a person who, because of intoxication or other condition of irresponsibility, is incapable of protecting or caring for himself, and holding such person under restraint until he has been restored to such condition that he is able to protect and take care of himself.

"If, having these legal principles in view, you should find from the evidence that the arrest and detention of the plaintiff was unlawful, then your verdict should be for the plaintiff.

"If you find from the evidence that, on May 11th, 1924, the plaintiff was in an intoxicated condition, was continuing to drink intoxicating liquors to excess and was on the verge of delirium tremens, and that he was taken into custody and held for safekeeping only until he was restored to a condition in which he could be released with safety to himself and others, and that he was not abused or mistreated while in custody, nor held in custody for an unreasonable length of time, then I instruct you that the plaintiff cannot recover in this case and your verdict must be for the defendants.

"You are instructed that, if you shall find from the evidence and the instructions of the court that the defendants lawfully arrested plaintiff and lodged him in the city jail, solely for the purpose of safekeeping, then I instruct you that it then became their duty to release him within a reasonable time after he became competent to care for himself, and if you shall find from the evidence that defendants failed to do so, but that they kept him in jail for an unreasonable length of time, then such imprisonment became wrongful and made the arrest wrongful from the beginning."

As we have before noticed, the officers who took the appellant into custody disclaimed the idea that they had placed him under arrest, and the instructions of the court seem to imply that the acts of the officers might or might not be an arrest, the fact depending upon the purpose and intent of the officers in taking him into custody. But while the courts have indulged in some refinements as to the meaning of the term arrest, the quarrel has been one over technical precision, rather than one over substance. In this instance, the officers took the appellant into their custody, took him to the city prison, and there confined him for an appreciable length of time. Manifestly, if these acts are called an arrest and imprisonment, or are called a taking into custody and restraint, their nature and effect are in no way changed. It is the acts

themselves that characterize the transaction, and if they are unlawful under one name, they are equally so under any other, and the intent of the officers is not a material inquiry.

It is our opinion that the facts show an unlawful arrest and a false imprisonment as a matter of law, and that the court should have so charged the jury. In this state, there is no statute defining the circumstances or conditions under which a person may be arrested without a warrant, but we have followed the general rule in this regard. We need not stop here to collect the cases, but we have repeatedly held that a police officer has no authority to make an arrest for a misdemeanor without a warrant of arrest, unless the misdemeanor is committed in the presence of the arresting officer. So, in this instance, if it be conceded that the appellant became intoxicated in his own home, and it be further conceded that to become intoxicated in one's home is in itself a misdemeanor, this would not justify an officer in entering the home and making an arrest without first procuring a warrant therefor. To authorize an arrest, under such circumstances, without a warrant, there must be some breach of the public peace. An officer may lawfully arrest a person without a warrant when he finds him intoxicated in a public place, and he may so arrest a person when he finds him intoxicated in his own home if the person is guilty of disorderly conduct therein such as disturbs the peace and quietude of the general public, or the peace and quietude of the people in the neighborhood in which he resides, but in all other instances, he must have in his possession a warrant of arrest issued by some court having jurisdiction of the offense, before the arrest is lawful.

Nor is a police officer authorized to confine a person indefinitely whom he lawfully arrests without a

warrant. It is his duty to take him before some court having jurisdiction of the offense, and make a complaint against him, and, from thence on, act with reference to the accused under the orders of the court. If a court having jurisdiction of the offense is open for the transaction of business at the time of the arrest, he must take the person arrested at once before the court. If no such court is then open, he may confine him until such time as the court does open, but he must act with reasonable promptness. Any undue delay is unlawful and wrongful, and renders the officer himself and all persons aiding and abetting therein wrongdoers from the beginning.

But in this instance, as we have stated, the arrest was unlawful in its inception. The appellant committed no offense which amounted to a breach of the peace. He was sleeping quietly in his home when the officers arrived at the place. The outer doors were locked, and the appellant did not appear at the sounding of the alarm bell. It was only after the officers had so acted as to indicate a purpose to break into the home that he opened the doors to them. But the strategy they used in gaining admittance to the home, or the strategy they used in getting the appellant to accompany them from the home does not relieve the transaction of its unlawfulness. The effect was that the appellant was deprived of his liberty and confined in the city prison for a period of eight days without even a charge of crime being made against him, and the most mild characterization of the acts of the officers is to say that they amounted to a false arrest and imprisonment.

The charge of the court, to the effect that a police officer is legally justified in taking into custody, without a warrant, a person who is, because of his intoxication or other condition of irresponsibility, in-

capable of protecting and caring for himself, and confining him until he recovers, we think is likewise erroneous. Undoubtedly, should a police officer find a person in a condition such as the court described, and in a situation where no one was caring for him and no one can be found who has the duty or is willing to assume that duty, they may take him into custody for a time being. The laws have appointed officers whose duty it is to care for such helpless persons, but police officers are not so appointed. The sole right and duty of a police officer, when he finds a person in such a helpless condition as to be incapable of caring for himself, is to take the person before an officer having legal authority to care for him and turn him over to the care of the officer. He may not lawfully detain him longer than the necessity of the case requires, and may not, under any circumstances, personally detain him until he recovers. Within this view of the law, the court's instruction was too broad; it did not sufficiently limit the conditions under which a police officer may take a helpless person into custody, and was wholly in error as to the disposition of such a person after a lawful taking into custody.

■ But in our opinion, an instruction in this instance on the subject at all was misleading and erroneous. The evidence did not justify submitting the question to the jury. The appellant was in his own home. He was not without care. On the contrary he was surrounded with such care as he had himself provided. Whether this care was adequate or inadequate, was not a question for the judgment of the police officers. They are empowered to act only when there is a helpless condition and an absolute want of care, not in instances where they may believe that some other method of care would be more adequate. The rule announced by the court would permit a police officer to

take into custody and lock in a prison a person in a helpless condition who is surrounded by the best care medical science can afford, if the officer believed that the treatment the helpless person was receiving was inadequate. The court, therefore, instead of instructing the jury as it did instruct, should have instructed them that the police were without authority to take him into custody at all.

It is argued by the respondents that, since the jury found in favor of the appellant, the question whether they were correctly instructed on the matters here discussed is a moot question, not now of concern to the appellant. But the verdict of the jury was for nominal damages only. It was wholly inadequate as compensation. Conceding that the appellant must be prejudiced both in law and in fact before he is entitled to a new trial, we are convinced that the record here shows that he was so prejudiced. That he was prejudiced in law, we have already attempted to demonstrate. That he was prejudiced in fact, we think appears in the inadequate verdict.

The judgment of the trial court is reversed, with instructions to grant the appellant a new trial.

TOLMAN, MAIN, FRENCH, and MILLARD, JJ., concur.

HOLCOMB, J. (dissenting)—I am unable to concur with the prevailing opinion as to the liability of the chief of police and his surety.

The chief of police, the bond and the surety are identically the same as were involved in *Pavish v. Meyers,* 129 Wash. 605, 225 Pac. 633, 34 A. L. R. 561.

In the above case, this court, in an *En Banc* decision, concurred in by all but one judge, held that the chief of police was not liable for a wrongful arrest by a policeman, and, the chief of police not being liable, his surety was therefore not liable.

In a later case, *Nunn v. Turner,* 133 Wash. 654, 234 Pac. 443, we held the chief of police and his surety liable for false imprisonment, where the chief of police had directed police officers to arrest the person they arrested and detain him for investigation, without any charge having been made against him; and further held that the chief of police could not escape liability from the fact that he was not personally present at the time the police officers carried out his commands.

In the instant case, the evidence discloses no orders or instructions from chief of police Severyns to arrest, detain or imprison appellant, or that the chief knew anything about it until after appellant had been released.

It is sought to distinguish this case from the *Pavish* case because of the Seattle charter provision that the chief of police is made the keeper of the city prison. That should make no difference. It was approved in the *Pavish* case, as the general rule, that a different rule prevailed in the case of the chief of a municipal police department than obtains respecting sheriffs and their deputies, even though the chief of police is charged with the duty of selecting the members of the force; that he is not responsible for their acts unless he has directed such acts to be done or has personally co-operated in the offense, for each policeman is, like himself, a public servant (citing authorities). It is also well known that the chief of police does not personally keep the city prison. He appoints a jailer for the purpose. He should no more be held responsible and liable for the acts of a jailer of which he has no knowledge, than he should be for the acts of a policeman of which he has no knowledge.

The same Seattle charter also contains provisions that were referred to in the *Pavish* case, to the effect

that the chief of police shall have and discharge like powers and be subject to like responsibilities as the sheriff of King county in similar circumstances; notwithstanding that, we held that he was not responsible and liable in the same degree as the sheriff of King county would be.

From our own cases and others which could be cited, in my opinion, the order discharging the chief of police and his surety in the court below should be affirmed. Upon this matter, I dissent, although concurring in the remainder of the decision as to the result.

BEALS and PARKER, JJ., concur with HOLCOMB, J.