William WHIRL, Appellant,

v.

C. V. (Buster) KERN and Fidelity and Deposit Company of Maryland, Appellees.

No. 24897.

United States Court of Appeals Fifth Circuit.

Dec. 30, 1968.

As Amended on Denial of Rehearing and Rehearing En Banc Denied March 4, 1969.

Charles David Kipple, Clarence F. Kendall, II, Houston, Tex., for appellant, Saccomanno, Clegg, Martin & Kipple, Houston, Tex., of counsel.

William R. Eckhardt, III, James R. Bertrand, Houston, Tex., for appellee C. V. (Buster) Kern, Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel.

Russell Talbott, Houston, Tex., for appellee Fidelity & Deposit Co. of Maryland, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

Before GOLDBERG and CLAYTON, Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

We review here, in an action for false imprisonment under Texas law [1] and for the deprivation of civil rights under 42 U.S.C.A. § 1983,[2] the custodial derelictions of a Texas sheriff.[3] The sheriff is accused of wrongfully overextending to an inmate of his jail the hospitality of his hostelry and the pleasure of his cuisine. The jury in the court below found for the sheriff. We reverse.

The evidence in this case is largely undisputed. On September 9, 1962, the appellant, William Whirl, was arrested on suspicion of felony theft by the City of Houston police and placed in the Houston city jail. Two days later Whirl was transferred to the Harris County jail where he was booked, identified and deprived of the use of his artificial leg. On September 20, 1962, an examining trial was held and Whirl was bound over to the Harris County Grand Jury.

Some weeks later the Grand Jury returned two indictments against him, one for burglary and one for theft.

On November 4, 1962, on the motion of the Harris County District Attorney, the indictments pending against Whirl were dismissed by a judge of the Criminal District Court of Harris County, Texas. The District Attorney had sought and obtained dismissal of the indictments on the grounds that the evidence against Whirl was "insufficient to obtain and sustain a conviction." The minutes of the court for November 5, 1962, recited the dismissal of the indictments, and a list of dismissals was then sent to the Sheriff's office, but the Sheriff who keeps the county jail testified that he was not apprised of these proceedings. As a result, Whirl languished in jail for almost nine months after all charges against him were dismissed, and was not restored to his freedom until July 25, 1963.

The breakdown in communication which led to Whirl's prolonged detention is not easy to trace. Documents are constantly transmitted among the courts, the District Clerk's office, the District Attorney's office, and the Sheriff's office, and recollection as to what happened in any particular instance is nec-

---

* Judge Clayton, the third judge constituting the court, participated in the hearing and the decision of this case. The present opinion is rendered by a quorum of the court pursuant to 28 U.S.C.A. §. 46, Judge Clayton having taken no part in the final draft of this opinion.

1. Cf. McBeath v. Campbell, Tex.Com.App. 1929, 12 S.W.2d 118.

2. 42 U.S.C.A. § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. 28 U.S.C.A. § 1343. Civil rights and elective franchise

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * * * *

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right, privilege of immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

essarily vague. Nevertheless, it is clear that the communication failure in Whirl's case occurred primarily between the District Clerk's office and the Sheriff's office.

Ordinarily, when charges are dismissed by a nolle prosequi, a member of the District Clerk's staff prepares a dismissal slip and forwards it to the Warrant Division of the Sheriff's office. Since the two offices are in the same building along with the jail, such communications are routinely made several times a day.

A record of the dismissals is also recorded in a journal or ledger kept in the District Clerk's office. This journal is sent to the Sheriff's office regularly, either separately or in conjunction with the dismissal slips, and receipt of the journal is acknowledged in writing by a sheriff's deputy. It is also customary for deputies in the Sheriff's office to make trips to the District Clerk's office in order to check the dismissal book themselves.

On the occasion following termination of charges against Whirl, dismissals had been rather numerous. As a result the Clerk's office prepared a list of cases which had been dismissed instead of the usual individual dismissal slip for each prisoner. This procedure, though rare, had been used before on similar occasions. Whirl's name was unquestionably included on that list, and the list was duly received by the Sheriff's office. Whirl's name was also entered in the dismissal book.

For some reason never adequately explained, the list of dismissals was not processed, and Whirl's freedom was lost in a shuffle of papers. Being too poor to raise bail, he was forced to remain in the courthouse lockup. Months later when attempts to set his case for trial prompted the District Attorney to check his file, it was discovered that all charges against him had been dismissed.

Following his release, Whirl filed this suit.

Whirl brought his action against C. V. (Buster) Kern, the Sheriff of Harris County, Texas, and against the Fidelity and Deposit Company of Maryland, the surety on the Sheriff's official bond. Trial was to a jury. At the close of all the evidence, plaintiff moved for a directed verdict, and when his motion was denied, the case was submitted to the jury on special interrogatories as to negligence, contributory negligence, proximate cause and damages. The jury found that Kern was not negligent in detaining Whirl in custody. It also found that Whirl was not contributorily negligent in failing to seek his own release, and that he had suffered no damages as a result of his imprisonment. On this appeal, Whirl contends that the district court erred in not granting his motion for a directed verdict and in denying his motion for a new trial as to damages. Appellant argues that all the elements of his cause of action under the Civil Rights Act and under the Texas law of false imprisonment were established as a matter of law by the undisputed evidence, and that no fact issue apart from damages remained for the jury. He further argues that the jury's finding of no damages was contrary to the weight of the evidence and that the district court erred in instructing the jury to disregard the removal of appellant's artificial leg in assessing the extent of his injury.

■ Appellee, Kern, responds to these allegations of error by defending each act of the district court, and by arguing in the alternative that his actions toward Whirl were outside the scope of the Civil Rights Act. Kern maintains that the Act is aimed only at reprehensible conduct, and that his incarceration of Whirl was entirely free of improper motive or unlawful intent.[4]

4. Appellees do not contest the fact that Whirl's incarceration was conducted under "color of law," nor do they contest the fact that he was deprived of liberty and due process as guaranteed by the Fourteenth Amendment. Cf. Bolling v.

## I.

Turning first to appellees' contention that the Civil Rights Act is limited in scope to reprehensible conduct, we note that some courts have so construed it. Hardwick v. Hurley, 7 Cir. 1961, 289 F. 2d 529, 530–531; Striker v. Pancher, 6 Cir. 1963, 317 F.2d 780, 784; Bargainer v. Michal, N.D.Ohio, 1964, 233 F.Supp. 270, 272–273; Raab v. Patacchia, S.D. Cal.1964, 232 F.Supp. 71–74; Beauregard v. Wingard, S.D.Cal.1964, 230 F. Supp. 167, 185; Selico v. Jackson, S.D.. Cal.1962, 201 F.Supp. 475, 478. However, in our view the trend of recent decisions and the language of the Statute itself cannot be reconciled with so restrictive an interpretation.

Decisions of the Supreme Court have repeatedly noted that a complaint under the Civil Rights Act should not be dismissed for failure to state "a specific intent to deprive a person of a federal right." Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 484, 5 L.Ed. 2d 492, 505; Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, 296. The Civil Rights Act, we are told, should be read "against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, supra. We do not find in this language or in the language of the Act itself any intimation that an invasion of constitutional rights unaccompanied by an improper motive lies beyond the reach of the Statute.

We are supported in this view by the recent decision of the Seventh Circuit in Joseph v. Rowlen, 7 Cir. 1968, 402 F.2d 367. In that case the Court of Appeals overruled some of its own earlier decisions, and in reversing a directed verdict for the defendant, disavowed the concept of improper motive:

"The formulae suggested at times for distinguishing causes of action which are cognizable in federal court from those which are not have usually required for a federal cause of action facts indicating flagrancy or an improper motive.

"One serious difficulty with such formulae is that there is nothing in the language of sec. 1983, or the fourth and fourteenth amendments as presently construed, on which to base such tests.

"Although the Supreme Court has found that certain defenses to a sec. 1983 cause of action exist, apparently by implication, they are defenses typical of tort causes of action." 402 F. 2d at 369.

Since Monroe v. Pape, supra, this Court has consistently avoided attaching any requirement of ulterior purpose or improper motive to the statement of a cause of action under 42 U.S. C.A. § 1983. Cf. Nesmith v. Alford, 5 Cir. 1963, 318 F.2d 110; Pierson v. Ray, 5 Cir. 1965, 352 F.2d 213, reversed on other grounds, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. Of course, when an essential element of the wrong itself

Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, 887; Delatte v. Genovese, E.D.La., 273 F.Supp. 654, 656. Therefore, apart from the "improper motive" or "unlawful intent" requirement, no dispute exists as to whether appellant has stated a cause of action under § 1983. Cf. Stringer v. Dilger, 10 Cir. 1963, 313 F.2d 536, 540.

Judicial immunity is likewise not a point of contention on this appeal. It is undisputed that Sheriff Kern did not act pursuant to any court order or certificate of commitment in restraining Whirl beyond the date when charges were dismissed. Cases which provide immunity to prison officials acting under court orders valid on their face are therefore inapplicable. Francis v. Lyman, 1 Cir. 1954, 216 F.2d 583; Dixon v. State of Maryland by Carter, D.Md.1966, 261 F.Supp. 746. Kern's failure to discover the dismissal of all charges against Whirl was the direct and sole cause of Whirl's unlawful detention. Discharge would have required no exercise of Kern's discretion or judgment. Under such circumstances, judicial immunity does not apply. Cf. Jobson v. Henne, 2 Cir. 1966, 355 F.2d 129, 133–134; Delatte v. Genovese, E.D. La., 1967, 273 F.Supp. 654, 658.

under well established principles of tort law includes the demonstration of an improper motive as in malicious prosecution, Nesmith v. Alford, supra, 318 F.2d at 110, 121, 128 n. 34, then such principle becomes a part of sec. 1983. But the origin of such a requirement is in the common law of torts, not in the Civil Rights Act. In cases where tort law imposes no such burden upon the plaintiff, we are not persuaded that the burden should be judicially imposed under sec. 1983. We think it inconsistent to say in one and the same breath that a man is "responsible for the natural consequences of his actions," Monroe v. Pape, supra, 365 U.S. at 187, 81 S.Ct. at 484, 5 L.Ed.2d at 505, and that he is responsible only if his actions are improperly motivated.

This treatment of the improper motive requirement appears in keeping with the Supreme Court's position on the availability of defenses under the Civil Rights Act. As we read Pierson v. Ray, good faith and probable cause are defenses to an arrest not because of any language in § 1983, but because § 1983 must be read in a manner consistent with the background of tort liability.

We see no reason why the improper motive requirement should not also be dependent upon the common law of torts. Nothing in the Civil Rights Act or in decisions of the Supreme Court compels otherwise. In fact, the unmistakable trend of judicial decisions has been away from the encrustation of the Civil Rights Act with judicially created limitations. Whereas the Act was once rigidly limited to instances of systematic discrimination[5] or physical brutality,[6] in recent years courts have shown themselves increasingly willing to entertain suits under § 1983 where even improper

motive is hard to find. Huey v. Barloga, N.D.Ill.1967, 277 F.Supp. 864; Quinnette v. Garland, C.D.Cal.1967, 277 F. Supp. 999; Delatte v. Genovese, E.D. La.1967, 273 F.Supp. 654; United States ex rel. Diamond v. Social Service Department, E.D.Pa.1967, 263 F.Supp. 971. Cf. Jobson v. Henne, 2 Cir. 1966, 355 F. 2d 129. In surveying this historical progression, we are, like the Seventh Circuit, impressed with the lack of justification for the improper motive requirement. We find no more basis for it in the language of the Act or in Supreme Court decisions than for the now rejected requirement of systematic discrimination. Cf. Cohen v. Norris, 9 Cir. 1962, 300 F.2d 24, 29–30. Certainly the one limitation is no more harmonious with the stated purposes of the statute than is the other. As said in Monroe v. Pape:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, *neglect*, intolerance *or otherwise*, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." (Emphasis added.) 365 U.S. at 180, 81 S.Ct. at 480, 5 L.Ed.2d at 501.

The Supreme Court's use of the term "neglect" and the expansive phrase "or otherwise" appears to us directly contrary to the "improper motive" requirement. Such language suggests that a federal forum is no less desirable for the inadvertent than for the malicious violation of constitutionally protected rights.[7] Cf. Huey v. Barloga, N.D.Ill.1967, 277 F.Supp. 864.

5. Stift v. Lynch, 7 Cir. 1959, 267 F.2d 237; Truitt v. State of Illinois, 7 Cir. 1960, 278 F.2d 819, cert. denied, 364 U.S. 866, 81 S.Ct. 109, 5 L.Ed.2d 88.

6. See cases discussed in Striker v. Pancher, 6 Cir. 1963, 317 F.2d 780, 784, and Daly v. Pedersen, D.Minn.1967, 278 F.Supp. 88, 94.

7. We find the facts of the instant case clearly illustrative of the great harm which may be done to constitutional rights even in the absence of malice or negligence.

Since Monroe v. Pape, federal courts have recognized that the Civil Rights Act *could* be read to mean that the purpose with which an unconstitutional act is perpetrated is not a prerequisite to a suit under § 1983. Hardwick v. Hurley, 7 Cir. 1961, 289 F.2d 529, 530. However, such a reading raised the spectre of a flood of litigation in the federal courts and was therefore promptly discarded. Hardwick v. Hurley, supra. Subsequent developments have shown that the purpose with which an unconstitutional act is done is highly relevant to recovery under § 1983, but relevant more as a source of defenses springing out of the common law of torts than as an obstacle to the statement of a § 1983 cause of action. Pierson v. Ray, supra. As a result, the court which originally uttered its apprehensions concerning a flood of litigation in the federal courts, has now given § 1983 its most expansive reading.[8] Joseph v. Rowlen, supra. In finding as we do that improper motive is not a prerequisite to suit under § 1983, we do not anticipate any rush upon the federal courts.[9] However, we say, with the court in Cohen v. Norris:

> "If giving effect to this Congressional intent will 'open the flood gates,' the remedy is not for this court to give § 1983 a narrower construction than Congress intended, but for Congress to decide whether it wishes to narrow the scope of the statute." 300 F.2d at 34.

## II.

Having dealt with the improper motive requirement at some length, we now turn to appellant's contention that he was entitled as a matter of law to a directed verdict on the question of liability. Appellant's argument in brief is that neither the common law of false imprisonment nor the Civil Rights Act requires that a jailer have actual knowledge that his prisoner's incarceration is contrary to law. Whirl contends that negligence is not an element of false imprisonment or of liability under § 1983, and that the "good faith" of a jailer is neither a defense to nor a justification for an unlawful restraint.

In evaluating these contentions, we are beaconed by the nascent case of Monroe v. Pape with illumination from Pierson v. Ray. In *Monroe* Chicago police officers without a search or arrest warrant took Monroe to a police station for interrogation, and while he was there, searched his home. In holding that the complaint alleged an invasion of § 1983 rights, Justice Douglas observed:

> "In the Screws Case we dealt with a statute that imposed criminal penalties for acts 'wilfully' done. We construed that word in its setting to mean the doing of an act with 'a specific intent to deprive a person of a federal right.' [Screws v. United States, 325 U.S. 91, at 103, 65 S.Ct. 1031, 89 L.Ed. 1495]. We do not think that gloss should be placed on § 1979 which we have here. The word 'wilfully' does not appear in § 1979. Moreover, § 1979 provides a civil remedy, while in the Screws Case we dealt with a criminal law challenged on the ground of vagueness. Section 1979 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365

8. It is also of some interest that the Sixth Circuit decision in Striker v. Pancher, supra, limiting § 1983 actions to reprehensible conduct is based largely on Seventh Circuit opinions.

9. Plaintiffs suing under § 1983 must still convince the courts that an alleged wrong was (1) committed under color of state or local law, and (2) that the injury caused a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. Stringer v. Dilger, 10 Cir. 1963, 313 F.2d 536, 540. These requirements limit prospective litigation to instances where recovery is sought for what has been termed "constitutional torts" committed under color of law. Cf. Shapo, Constitutional Tort: Monroe v. Pape, and the Frontiers Beyond, 60 N.W.L.Rev. 277 (1966).

U.S. at 187, 81 S.Ct. at 484, 5 L.Ed.2d at 505.

Seven years after *Monroe* the Supreme Court decided Pierson v. Ray, supra. *Pierson* involved the alleged false arrest of Negro and white clergymen for breach of the peace under a Mississippi statute when they attempted to use segregated facilities at an interstate bus terminal in Jackson, Mississippi. Our Court of Appeals had earlier decided that a police officer's good faith and his reliance upon a state statute subsequently declared invalid were not available as defenses under § 1983. In reversing, the Supreme Court said with reference to the proper interpretation of its decision in *Monroe*:

> "* * * but this holding, which related to requirements of pleading, carried no implications as to which defenses would be available to the police officers. As we went on to say in the main paragraph, § 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' 365 U.S., at 187, [81 S.Ct. at 484, 5 L.Ed.2d at 505.] Part of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause.

> "We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." Pierson v. Ray, supra 386 U.S. at 556, 87 S.Ct. at 1219, 18 L.Ed.2d at 296.

■ While the issue of Sheriff Kern's "good faith" in confining Whirl in prison was never in so many words presented to the jury, we do not involve ourselves in the semantics of whether or not a finding of non-negligence is tantamount to a finding of good faith. As we read Pierson v. Ray and Monroe v. Pape, neither good faith nor non-negligence can exculpate Kern from liability.

■ Pierson v. Ray and Monroe v. Pape were on their facts, false arrest cases and not false imprisonment cases. While it is certainly true that false arrest cases are often denominated actions for false imprisonment, i. e., *Pierson* and *Monroe*, false imprisonment deriving from an arrest and false imprisonment where no arrest has occurred are in substance quite different. Cf. Restatement of Torts, Second, §§ 35–45 and §§ 112–139. Admittedly, a person who is falsely arrested is at the same time falsely imprisoned, Fox v. McCurnin, 1928, 205 Iowa 752, 218 N.W. 499, yet "it is not necessary, to commit false imprisonment, either to intend to make an arrest or actually to make an arrest." 32 Am.Jur. 2d, False Imprisonment, § 2 (1968); Titus v. Montgomery Ward & Co., 232 Mo.App. 987, 123 S.W.2d 574; McGlone v. Landreth, 1948, 200 Okl. 425, 195 P.2d 268. "False arrest is merely one means of committing a false imprisonment." Harrer v. Montgomery Ward & Co., 1950, 124 Mont. 295, 221 P.2d 428, 433.

■ In ascertaining whether the Supreme Court intended the defense of "good faith" to apply to false imprisonment as well as to false arrest, we must not allow a superficial similarity between essentially different causes of action to dictate the purpose which the good faith defense is meant to serve in the context of the Civil Rights Act. There can be no quarrel with the fact that "good faith" in the circumstances of an arrest is a necessary and historically validated defense. As said by the Supreme Court in *Pierson*, "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U. S. at 555, 87 S.Ct. at 1218, 18 L.Ed.2d at 295.

The reasons for this broad protection are clear. An arrest is often a stressful and unstable situation calling for discretion, speed, and on-the-spot evaluation. Quinnette v. Garland, C.D.Cal.1967, 277 F.Supp. 999, 1002. As a result, constab-

ulary latitudinarianism is important, and peace officers are and must be endowed with privileges not accorded to ordinary citizens. In the words of the editors of the Restatement of Torts, Second:

"The additional privilege is given because the peace officer has a duty to the public to prevent crime and arrest criminals; the performance of these duties would be seriously impaired unless peace officers were given considerable discretion in their performance and protected from liability for the consequences of honest and reasonable mistakes." § 121, Comment (b) and (c) at 206.

Appellees urge that the above rule is their shield and protection. However, the breadth of a peace officer's privilege in an arrest situation is not necessarily the test of the breadth of a jailer's privilege in the context of a false imprisonment. There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence. Birdsall v. Lewis, 1936, 246 App.Div. 132, 285 N.Y.S. 146; Waterman v. State, 1957, 2 N.Y.2d 803, 159 N.Y.S.2d 702, 140 N.E.2d 551; Cohen v. State, 1965, 47 Misc.2d 470, 262 N.Y.S.2d 980, reversed on other grounds, 25 A.D.2d 339, 269 N.Y.S.2d 498; Weigel v. McCloskey, 1914, 113 Ark. 1, 166 S.W. 944; 46 A.L.R. 806. While a jailer cannot be held liable for errors in a warrant of commitment fair and valid on its face, Francis v. Lyman, 1 Cir. 1954, 216 F.2d 583; Peterson v. Lutz, 1942, 212 Minn. 307, 3 N.W.2d 489, it is also the law that where a prisoner is held in jail without a court order or written mittimus, the jailer is liable for false imprisonment. Garvin v. Muir, Ky.1957, 306 S.W.2d 256. The fact that the jailer is without personal knowledge that the prisoner is held unlawfully does not constitute a de-

fense to an action for false imprisonment. Garvin v. Muir, supra; Ulvestad v. Dolphin, 1929, 152 Wash. 580, 278 P. 681; Great American Indemnity Co. v. Beverly, M.D.Ga.1956, 150 F.Supp. 134, 141. In fact, "An illegal imprisonment must be treated as a wrong from its very inception, and it matters not on what date knowledge of such illegality is acquired." Emanuele v. State, 1964, 43 Misc.2d 135, 250 N.Y.S.2d 361, 366.

The case at bar is not, as appellees would have us view it, a case of justifiable reliance upon a warrant of commitment valid on its face. Cf. Francis v. Lyman, supra; Peterson v. Lutz, supra. The sheriff relied on nothing[10] and his actions were not informed actions. Nor is this a situation where the dismissal of an indictment by a grand jury still leaves questions for judicial determination. Cf. Lowry v. Thompson, 1936, 53 Ga.App. 71, 184 S.E. 891. Proceedings against Whirl were terminated by the actions of a court of competent jurisdiction. While not easily characterized, the case at bar seems to us closest to the situation where the jailer keeps a prisoner beyond the lawful term of his sentence. In such circumstance, as in the one before us, ignorance of the law is no excuse.

We do not read Pierson v. Ray as mandating otherwise. The instruction that § 1983 is to be read against the background of tort liability does not seem to us a directive that "good faith" is a defense to all actions under the Civil Rights Act. Rather Pierson impressed the common law of torts into the service of the Civil Rights Act, and thereby made "good faith" a defense to a suit under § 1983 only where it is also a defense "under the prevailing view [of tort law] in this country." 386 U.S. at 555, 87 S.Ct. at 128, 18 L.Ed.2d at 295.

---

10. The indictments against Whirl and the arrest warrant were rendered functus officio by the nolle prosequi. A nolle prosequi terminates a prosecution, and there is no longer any legal authority to detain the accused in custody. Venters v. State, 1885, 18 Tex.App. 198; Ex parte Minus, 1931, 118 Tex.Cr.R. 170, 37 S.W.2d 1040. Appellees' reliance upon the arrest warrant and the indictments is thus misplaced.

■ We do not find any cases nor are we referred to any by counsel which provide that "good faith" is a defense to an imprisonment that is not only without valid process, but contrary to it. Nor do we believe as a matter of federal policy that such a defense should be available to a jailer in circumstances like those before us. The responsibility for a failure of communication between the courts and the jailhouse cannot justifiably be placed on the head of a man immured in a lockup when the action of the court has become a matter of public record. Ignorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom. A jailer, unlike a policeman, acts at his leisure. He is not subject to the stresses and split second decisions of an arresting officer, and his acts in discharging a prisoner are purely ministerial. Moreover, unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. While not a surety for the legal correctness of a prisoner's commitment, Ravenscroft v. Casey, 2 Cir. 1944, 139 F.2d 776, cert. denied, 323 U.S. 745, 65 S.Ct. 63, 89 L.Ed. 596; DeWitt v. Thompson, 1942, 192 Miss. 615, 7 So.2d 529, he is most certainly under an obligation, often statutory,[11] to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.

■ The central issue in this case is one of privilege, not of intent; one of law, not of fact. The tort of false imprisonment is an intentional tort. Restatement of Torts, Second, § 44. It is committed when a man intentionally deprives another of his liberty without the other's consent and without adequate legal justification. Roberts v. Hecht Co., D.Md.1968, 280 F.Supp. 639, 640; Browning v. Pay-Less Self Service Shoes, Inc., Tex.Civ.App.1963, 373 S.W. 2d 71 (no writ); 32 Am.Jur.2d, False Imprisonment § 1 (1968). Failure to know of a court proceeding terminating all charges against one held in custody is not, as a matter of law, adequate legal justification for an unauthorized restraint. Were the law otherwise, Whirl's nine months could easily be nine years, and those nine years, ninety-nine years, and still as a matter of law no redress would follow. The law does not hold the value of a man's freedom in such low regard.

■ The sheriff, of course, must have some protection too. His duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained. We are not to be interpreted as holding that a sheriff commits an instant tort at the moment when his prisoner should have been released. However, in the present case what is or is not a reasonable time is not at issue. It may safely be said that Kern's ignorance for nine long months after the termination of all proceedings against Whirl was, as a matter of law, ignorance for an unreasonable time.

In the law of commercial transactions, it is common practice to hold that a person is on constructive notice of certain facts essential to the security of all who must deal with him. In such cases it is often said: "Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge." Flack v. First National Bank of Dalhart, 1950, 148 Tex. 495, 226 S.W.2d 628, 632. Likewise in the law of property, notice of a deed in a chain of title actually unknown to a purchaser and found in a musty and dusty tome of records in some recorder's office is the daily grist of judicial decisions. Cf. Farmers Mutual Royalty Syndicate v. Isaacks, Tex.Civ.App.1940, 138 S.W.2d 228, 231 (no writ). If constructive notice can be thus pressed into the service of property, can it not also be urged in the service of human liberty? We think that it can, and that a sheriff must be held to be on constructive notice

11. See Vernon's Ann.Tex.Rev.Civ.Stat. Art. 5116 (1962).

of the judicial termination of all charges against one in his care and custody.

We hold that it was error for the trial court to submit this case to the jury on the basis of negligence. We find on the record before us that Sheriff Kern was chargeable with constructive notice of the termination of all proceedings against Whirl, or alternatively, that absence of such notice was not a legal justification for Whirl's continued imprisonment. The district court should have granted plaintiff's motion for directed verdict as to liability, and left for the jury only the issue of damages.

### III.

We direct our attention next to appellant's claim for false imprisonment under Texas law. Although there is no diversity of citizenship between the parties, we find that quite apart from appellant's claim under § 1983, he is entitled under the doctrine of pendent jurisdiction to a consideration of his state cause of action. In reaching this result we look to the words and spirit of United Mine Workers v. Gibbs, 1966, 383 U. S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. *Gibbs* teaches us that litigation should not be fissioned or atomized where both federal and state causes of action arise out of "a common nucleus of operative fact." 383 U.S. at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 228.

In the case at bar there can be no doubt that Whirl's claims for false imprisonment and for violation of his civil rights arise out of "a common nucleus of operative fact." The district court below has already exercised its discretion in considering Whirl's state as well as his federal cause of action. Under such circumstances, unless it can be said that the federal claim involved was frivolous or clearly foreclosed by prior Supreme Court decisions, Rumbaugh v. Winifrede Railroad Company, 4 Cir. 1964, 331 F.2d 530, cert. denied, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341, "the strong and practical policies undergirding the pendent jurisdiction doctrine require that * * * [the state cause of action] * * * be determined by a federal forum." Connecticut General Life, et al. v. Craton, et al., 5 Cir. 1968, 405 F.2d 41.

The Texas law of false imprisonment zealously safeguards the rights of citizens to be free of unlawful arrest and unlawful prison detention. Protection is provided by statute[12] and by common law. Box v. Fluitt, Tex.Civ.App.1932, 47 S.W.2d 1107 (no writ). Persons found guilty of false imprisonment are subject to both criminal and civil penalties,[13] while those wrongfully imprisoned are favored with a statutory grant of aid and compensation.[14] Traditionally the Texas courts have also shown considerable solicitude for the

---

12. Vernon's Ann.Tex.P.C. Article 1169: "False imprisonment"

 False imprisonment is the wilful detention of another against his consent and where it is not expressly authorized by law, whether such detention be effected by an assault, by actual violence to the person, by threats or by any other means which restrains the party so detained from removing from one place to another as he may see proper.

13. Tex.Pen.Code Ann. Art. 1174: Penalty
 Any person guilty of false imprisonment shall be fined not exceeding five hundred dollars or be confined in jail not exceeding one year.

14. Tex.Pen.Code Ann. Art. 1176a: Aid and compensation to persons wrongfully imprisoned

Legislative finding and statement of policy

Section 1. The Legislature finds that the people of Texas by adding to the Constitution of the State of Texas, Article III, Section 51-c, on November 6, 1956, have adopted the policy that persons who have served sentences in prison for crimes of which they are not guilty should not bear the loss occasioned by this error, but that the people of the State should provide such persons with compensation to reimburse and compensate them for their losses. It is the purpose of this Act to provide the means whereby such compensation may be obtained by persons so wronged.

 * * * * *

rights of persons wrongfully restrained of their liberty. As said in McBeath v. Campbell, Tex.Com.App.1929, 12 S.W.2d 118, 120:

"* * * any arrest or imprisonment of any citizen of this state, no matter how poor or obscure, and no matter what may be his station in life, except as allowed or required by the laws of this state is a violation of the Constitution of this state, and the courts of this state, when appealed to, will redress such wrong if it can be done in a lawful manner."

The *McBeath* case involved both a false arrest and an unlawful prison detention. The plaintiff, one P. M. McBeath, was arrested by a deputy sheriff of Wilbarger County, Texas, on suspicion of murder and was taken to the Wilbarger County jail. The plaintiff was then kept in jail from Sunday night to the following Wednesday without being taken before a magistrate. Upon his release, he sued the sheriff of Wilbarger County for false imprisonment. The sheriff defended on the grounds that he had not taken part in the false arrest and, in fact, had not even known that the plaintiff was being held in the county jail until the day before plaintiff's discharge. In an opinion approved by the Texas Supreme Court, the Commission of Appeals ruled that while the sheriff was not liable for the false arrest initiated by his deputy, he was liable in false imprisonment for failing to know the authority upon which his prisoner was held in the county jail:

"Certainly when the sheriff finds out that a prisoner is confined in his jail, which the law makes him the keeper of, and holds him responsible for, it is his duty to know by what authority he is confined therein, and he cannot close his eyes and fail to make investigation and excuse himself on the ground of lack of knowledge * *." 12 S.W.2d at 123.

In the case at bar Sheriff Kern is charged with the same statutory duty "to make investigation" as was the defendant in *McBeath*. As indicated by Article 5116 of the Texas Civil Statutes:

"Each sheriff is the keeper of the jail of his county. He shall safely keep therein all prisoners committed thereto by lawful authority, subject to the order of the proper court, and shall be responsible for the safe keeping of such prisoners. The sheriff may appoint a jailer to take charge of the jail, and supply the wants of those therein confined; but in all cases the sheriff shall exercise a supervision and control over the jail."

The McBeath case demonstrates that the statutory obligations of a Texas sheriff are not amorphous ones. Conjoined with the statutory duty of a sheriff to protect his prisoners is the statutory duty to make investigation of the authority upon which they are held. Nothing is said in the statutes or in the Texas cases about a good faith defense or a defense of non-negligence to a suit for unlawful incarceration. Good faith may clear the conscience, but it does not redeem or purge the act. Kern reads Article 5116 of the Texas Civil Statutes as if he had no duty to determine the authority upon which his prisoner was held. But the duty to release is absolute if no such authority exists, and such duty cannot be conditioned on notice, solicitation, ignorance or blindness. Ignorance of the law is traditionally no excuse, even when a man's own liberty is at stake. Should it be a defense for officers of the law whose sworn duty it is to protect the liberty of others? Are a sheriff's statutory obligations to be effective only when he acts in willful disobedience of his official responsibilities?

The evidence is undisputed that Kern could have known of the dismissal of charges against Whirl had he only made inquiry. But inquiry he did not make, and as a consequence Whirl, quasi-literate and one legged, languished in jail for nine months after he was entitled to be free of his fetters. Unfortunately, non-malicious restraint is no sweeter

than restraint evilly motivated, and we cannot sanction chains without legal justification even if they be forged by the hand of an angel. Neither the sheriff's tears of regret nor explanations keyed the lock to unmanacle Whirl. Though we apply all the benign adjectives in our lexicon to Kern's watchmanship—these do not make Whirl a November to July free man.

■ As we understand the Texas law of false imprisonment, read in conjunction with the statutory duties of the sheriff as keeper of the county jail, non-negligence is no modifier of liability. Sheriff Kern had an unyielding duty to know his prisoner's sentence time, and this duty was not discharged.

■ Appellees' other defenses to appellant's claim for false imprisonment are also without merit. Appellees contend that Sheriff Kern is not liable for Whirl's unauthorized detention because he had no personal knowledge that Whirl was being held in the county jail. Absent such knowledge, the detention is said to be the act of Kern's deputies. Under Texas law a sheriff is liable for the unauthorized acts of his deputies only if he has in some way ratified them. Workman v. Freeman, 1956, 155 Tex. 474, 289 S.W.2d 910. Since Kern did not even know that Whirl was in jail, appellees say he did not ratify the detention and cannot be held liable for it.

■ Accepting as we must Kern's uncontradicted statement that he was ignorant of Whirl's presence in the county jail, we are nonetheless of the opinion that the principle of law cited to us by appellees is not apposite to the case at bar. The cases to which we are referred deal with such matters as false arrests, illegal searches and seizures, and acts of brutality committed by deputy sheriffs without the knowledge or ratification of the sheriff himself. Workman v. Freeman, supra; Maddox v. Hudgeons, 1903, 31 Tex.Civ.App. 291, 72 S.W. 414 (writ ref'd.); Sheppard v. Gill, Tex.Civ.App. 1933, 58 S.W.2d 168, aff'd. 126 Tex. 603, 90 S.W.2d 563; Taylor v. Stanford, Tex.Civ.App.1950, 229 S.W.2d 427 (no writ); Rhoden v. Booth, Tex.Civ.App. 1961, 344 S.W.2d 481 (writ ref'd. n. r. e.). These cases turn upon the application of Tex.Rev.Civ.Stat.Ann. Art. 6870 (1960) which provides:

"Sheriffs shall be responsible for the official acts of their deputies, and they shall have power to require from their deputies bond and security; and they shall have the same remedies against their deputies and sureties as any person can have against a sheriff and his sureties."

■ The applicability of this statute to instances of unauthorized prison detention was considered and rejected in McBeath v. Campbell, supra. That case indicated that inasmuch as Article 5116, places the responsibility for the county jail directly upon the county sheriff, he is charged as a matter of law with the responsibility for unlawful detentions. This statutory obligation cannot be avoided by delegating authority over the jail to deputies or other subordinates. Article 5116 says quite explicitly that the sheriff shall "exercise a supervision and control over the jail." We do not think it is possible for the sheriff to discharge his supervisory duties and also to remain ignorant for a protracted period of a prisoner's very presence in his jail.[15]

15. Cf. *Ulvestad v. Dolphin,* 1929, 152 Wash. 580, 278 P. 681, 683:
"By the terms of the charter the chief of police is made 'the keeper of the city prison,' and the question is whether the duty imposed upon him by the charter renders him liable for the conduct of the persons immediately in charge of the prison, notwithstanding he may not have participated in or known of such conduct. It is our opinion that it does.

As keeper of the city prison, the chief of police is bound in law to know who is confined therein, and bound to know the purpose for which any person confined therein is so confined. He cannot escape his obligations in this respect by placing the prison in the keeping of others. If he does so, such others are his agents and he is responsible for their acts."

Nor do we think that the court in *McBeath* intended the sheriff to have a duty to investigate the authority upon which a prisoner is held, but not to have the duty to ascertain whether there is a prisoner to be investigated. The one responsibility necessarily implies the other. In point of fact, the case at bar involves no issue of ratification and no unlawful acts by the sheriff's deputies. The sheriff's responsibilities over the jail do not arise out of the acts of his agents, but have a direct statutory derivation. The statute gives the sheriff the duty to ascertain the authority upon which a prisoner is confined. The failure to make such a determination is his act and his act alone.[16]

 The view which we take of Sheriff Kern's statutory responsibilities makes it necessary to hold that the Fidelity and Deposit Company of Maryland, surety on the Sheriff's bond, is also liable for the damages sustained by appellant Whirl. The general rule in Texas is:

"* * * in order to recover of the sureties upon the official bond of a sheriff or constable for a trespass committed by him, it must be shown that the act was done in the performance of a duty legally imposed upon him by virtue of his office." Continental Casualty Company v. Miller, Tex.Civ.App.1940, 135 S.W.2d 501, 502 (no writ).

The Texas courts have held that a sheriff's failure to take a person under arrest before a magistrate as required by statute is such a dereliction of duty as to make the sheriff and his sureties liable for false imprisonment. King v. Roberts, Tex.Com.App.1935, 125 Tex. 623, 84 S.W.2d 718; Branch v. Guinn et al., Tex.Civ.App.1922, 242 S.W. 482 (no writ). Likewise we hold that Sheriff Kern's failure to investigate the authority upon which Whirl was confined as required by statute was such a breach of his official duty as keeper of the county jail, Tex.Rev.Civ.Stat.Ann. art. 5116 (1962), as to impose liability upon his surety. . . .. .

### IV.

We come finally to the question of damages. In this regard appellant assigns two fundamental errors in the trial court's instructions to the jury. Appellant first complains of the court's instruction that the jury disregard the removal of appellant's artificial leg in assessing the extent of his injuries. Evidence was introduced to show that the prolonged deprivation of appellant's artificial limb while he was in prison caused the tendons of his leg to contract and the tissues to swell. The court instructed the jury not to award damages on the basis of this evidence if the jury found that the leg had been removed in order to enforce reasonable rules of jail discipline.

 The legal basis for the court's instruction is the general rule that it is not the proper function of courts to interfere in the internal management and discipline of prisons. United States ex rel. Knight v. Ragen, 7 Cir. 1964, 337 F.2d 425, cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277; Rhodes v. Houston, D.Neb.1962, 202 F.Supp. 624, aff'd., 8 Cir., 309 F.2d 959, cert. denied, 372 U.S. 909, 83 S.Ct. 724, 9 L.Ed.2d

16. Workman v. Freeman, 1956, 155 Tex. 474, 289 S.W.2d 910, and its predecessors are not inconsistent with this result. Liability in those cases was *not* predicated upon the sheriff's jailhouse responsibilities. Thus the court in *Workman* was careful to point out that the suit against the sheriff was for acts of brutality committed by the deputies, and not for false imprisonment. The court also noted that there were no allegations "that the sheriff was guilty of any undue delay the next morning in finding out the facts about Workman's being in jail or in taking such appropriate action as the facts required." 289 S.W.2d 910, 912. Such language reinforces the holding in *McBeath* by suggesting that had false imprisonment been involved in *Workman*, an "undue delay" by the sheriff in finding out the facts about his prisoner would have resulted in liability. Certainly an unlawful detention lasting for nine months involves, as a matter of law, an "undue delay."

719. However, such rule has been applied primarily where improper treatment within the jail is urged as the basis of *a cause of action*, not where the basis of such cause of action is established on grounds wholly independent of jail discipline. Whirl does not argue that the wrong done to him was the deprivation of his leg, or that his jailers had no right to take it from him. He argues rather that if he had been given his freedom when he became entitled to it, there would have been no need to enforce jail discipline against him. He argues, in other words, that the pain and suffering produced by the loss of his artificial limb were no less natural consequences of his wrongful detention than were his lost earnings, his physical discomfort, or his mental anguish.

We see no reason why Whirl should not recover for the pain and suffering caused by the loss of his artificial leg. The recovery of damages in actions for false imprisonment includes recovery for physical and mental injury, Coffin v. Varila, 1894, 8 Tex.Civ.App. 417, 27 S.W. 956 (no writ), as well as for physical discomfort in jail. San Antonio & A. P. Ry. Co. v. Griffin, 20 Tex. Civ.App. 91, 48 S.W. 542 (writ ref'd.). So long as a jury finds that the injury was the natural consequence of the false imprisonment and proximately related to it, Cf. Southwestern Portland Cement Co. v. Reitzer, Tex.Civ.App.1911, 135 S.W. 237 (no writ), no reason exists to treat the loss of Whirl's artificial limb any differently from his other jailhouse deprivations.[17] We do not perceive how such a rule will interfere with sound jail discipline, for the *sine qua non* of any jail discipline is the lawful incarceration of the prisoner. So long as the prisoner is lawfully restrained, the jailer will be accorded reasonable discretion in the fulfillment of his legitimate duties.

Appellant's second grievance concerning the court's instructions on damages relates to the issue of contributory negligence. The trial court instructed the jury that if it found Whirl had been contributorily negligent in not exercising "ordinary care to request a hearing before the court, or to request the services of a court appointed attorney," then the jury was to reduce the amount of damages awarded, if any, by the amount that Whirl's exercise of care might have mitigated his injury. The jury found in answer to special interrogatories that Whirl had not been contributorily negligent, and therefore he has not been prejudiced by the instruction. However, inasmuch as the issue of damages will have to be submitted to a new jury, we find it necessary to pass on the merits of the court's instruction.

We find that the instruction on contributory negligence was error. Under the circumstances of this case the duty to mitigate damages in the wake of Kern's wrongful act could only arise if Whirl knew during his confinement he was being injured and if he intentionally or heedlessly failed to protect his own interests. While the general rule is that

"a person injured by the tort of another is not entitled to recover damages for such harm as he could have avoided by the use of due care after the commission of the tort," Restatement of Torts, § 918(1) (1939),

the standard of care imposed upon the victim of an intentional tort[18] is somewhat different. Thus:

"A person is not prevented from recovering damages for a particular

---

17. Since Whirl was lawfully in jail subsequent to his arrest and prior to the dismissal of the indictments against him, apportionment of his claim for the deprivation of the artificial leg would seem appropriate. If the jury finds that the leg was taken from him pursuant to the enforcement of a reasonable rule of jail discipline, then Whirl's recovery for the loss of his artificial leg should be reduced by an amount proportionate to the time he was *lawfully* in jail.

18. The harm intended by a tortfeasor in committing an act of false imprisonment is not the intent to *wrongfully* confine, but simply the intent to cause the confinement. Restatement of Torts, Second, § 44 (1965).

harm resulting from a tort if the tortfeasor intended such harm or adverted to it and was recklessly disregardful of it, unless the injured person with *knowledge of the danger of such harm intentionally or heedlessly failed to protect his own interests*. (Emphasis added.) Restatement of Torts, § 918 (2) (1939).

It is argued by appellees that Whirl contributed to his own injury because he misled his jailers into believing that he was making efforts, through his family, to secure a lawyer, and as a consequence of these assurances, Sheriff Kern's deputies delayed setting his case for trial. Not until Whirl requested a court appointed attorney did the deputies check his file in the District Attorney's office and discover that all charges against him had been dismissed. Whirl's delay in procuring an attorney, and his assurances that he was going to get one, are the alleged underpinnings of his want of due care.

The difficulty with appellees' position is that it assumes Whirl had the duty to mitigate the consequences of an injury of which he was not even aware. So far as Whirl knew he was being detained on lawful process. His prolonged efforts to secure an attorney of his own choosing, while perhaps dilatory, were predicated on the expectation that the attorney would be needed at trial and not before. Furthermore, Whirl was unfamiliar with the routine of the jail or of the District Attorney's office. He could not have known that according to procedures adopted by his jailers, his file would not be checked until his case was set for trial or until the services of a court appointed attorney were requested. But even had he known of such procedures, he had no reason and most important no duty to know whether charges against him had been dismissed. His jailer, on the other hand, had both the duty and the ability to verify the authority upon which his prisoner was held. The District Attorney's office was in the same building as the jail. A minute would have sufficed to verify the lawfulness of Whirl's detention.

The corollary of Kern's argument is that Whirl had a duty to ferret out his own release order and to free himself. Yet obviously Whirl, immobilized by incarceration, had no opportunity to scan documents and to determine the lawfulness of his detention. It was Kern who had the staff and the freedom of the courthouse to determine his detainees without let or hindrance. Between two so unevenly matched equities, we do not hesitate in declaring Whirl's right to receive full compensation for his injuries.

Viewed on one level, the facts of this case involve nothing more grandiloquent than paper pushing between officers in the Harris County Courthouse. Yet we must never forget that we are dealing with a man's liberty, and a game of who has the paper and who saw the paper is not constitutionally playable. This must be borne in mind in the assessment of damages. Traditionally the fact of an illegal restraint creates the right to recover at least *nominal* damages. Fouraker v. Kidd Springs Boating and Fishing Club, Tex.Civ.App.1933, 68 S.W.2d 796 (no writ). Perhaps in some circumstances that is all a man's freedom is worth, but though the price tag be a bargain, freedom is never valueless. A jury finding that a man's freedom is worthless is clearly erroneous. It is an impossible judgment to render against a sentient person, be he one legged, unschooled, friendless or without earning capacity.

There is the promise outstanding that the courts will redress the false imprisonment of any man, "no matter how poor or obscure, and no matter what may be his station in life." McBeath v. Campbell, supra, 12 S.W.2d at 122. Let that promise be fulfilled.

Reversed and remanded.

On Petition for Rehearing and Rehearing En Banc

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the

Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

COLEMAN and SIMPSON, Circuit Judges, dissent from the denial of rehearing en banc.